UNITED STATES of America, Appellee,

v.

**Charles Bruce NABORS, Appellant.**

UNITED STATES of America, Appellee,

v.

**John Calvin NABORS, Jr., Appellant.**

**Nos. 84–2439, 84–2249.**

United States Court of Appeals, Eighth Circuit.

Submitted March 11, 1985.

Decided May 16, 1985.

Rehearing and Rehearing En Banc in No. 84–2249 Denied June 17, 1985.

Rehearings En Banc in No. 84–2439 Denied June 21, 1985.

---

See also, 761 F.2d 1227.

**644**

Samuel A. Perroni, Little Rock, Ark., for appellant in No. 84–2249.

William C. McArthur and Jack Lassiter, Little Rock, Ark., for appellant in No. 84–2439.

Robert L. Neighbors, Asst. U.S. Atty., Little Rock, Ark., for appellee.

Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and SACHS,* District Judge.

SACHS, District Judge.

The defendant brothers, Charles Bruce Nabors and John Calvin Nabors, Jr., appeal

---

\* The HONORABLE HOWARD F. SACHS, United States District Judge for the Western District of Missouri, sitting by designation.

from a final judgment entered in the district court[1] after a jury verdict finding each of them guilty of bank robbery by means of a deadly weapon and conspiracy to commit bank robbery in violation of 18 U.S.C. §§ 2113(d) and 371. The trial judge sentenced Bruce Nabors to a term of eighteen years on the bank robbery count and to a concurrent five year term of imprisonment on the conspiracy count; John Nabors received a twenty year term for bank robbery (consecutive to a twenty year term of imprisonment he was presently serving) and a five year concurrent sentence on the conspiracy count.

For reversal, both defendants argue that the district court erred in (1) not granting their motions for mistrial or dismissal of the indictment when it was discovered, during closing arguments, that there were two versions of the indictment in this case, only one of which had been seen by defendants prior to trial, and (2) in not declaring a mistrial when Government counsel allegedly commented indirectly during closing argument on the defendants' failure to testify. In addition, defendant John Nabors urges the following grounds for reversal: that his motion for severance, or, in the alternative for mistrial, should have been granted; that the prosecutor was permitted to improperly lead a child witness; that a proposed jury instruction prohibiting a finding of guilt by association should have been given; and that the evidence presented at trial was insufficient as a matter of law to establish that John Nabors was guilty of the charges under either count of the indictment.[2] For the reasons discussed below, we affirm the convictions.

The facts can be summarized as follows, keeping in mind that the evidence must be construed in the light most favorable to the jury verdict. *See Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). On December 2, 1983, at approximately 10:45 a.m., the National Bank of Arkansas, in North Little Rock, Arkansas, was robbed of approximately $112,000 by two masked men. One of the robbers covered the bank surveillance camera and then held a gun on bank employees. The other proceeded to jump on and over a teller counter and then put bank funds into a bag he was carrying. No bank employee or customer was able to identify either robber. There was testimony, however, that both robbers carried guns, that the one who jumped on the teller counter was wearing boots, that both robbers left the scene of the crime in a black Jeep Wagoneer, and that the robber who drove the getaway vehicle pulled off his mask as he drove off, revealing that he was white.[3] Ron Tullos, the bank's president, unsuccessfully tried to follow the robbers in his own car. Several minutes later, law enforcement personnel located the abandoned Jeep Wagoneer a short distance from the bank behind a shopping center.[4] Leading from the vehicle to a high school parking lot nearby was a muddy incline. Police located and covered a fresh bootprint on this incline leading downwards toward the parking lot. Shoe prints from the teller counter were also dusted and preserved.

1. The Honorable George Howard, Jr., United States District Judge for the Eastern and Western Districts of Arkansas.

2. Shortly before oral argument of this case, Bruce Nabors' counsel moved for leave to withdraw. Apparently, Bruce Nabors had dismissed his retained trial counsel and desired to proceed pro se. The motion was granted with the condition that "[if] newly retained counsel does not appear to present argument ... the case will be submitted on the briefs." No representative appeared on behalf of Bruce Nabors at oral argument. However, defendant did file a motion "to vacate order and reconsider motions" which sought to raise a number of new grounds for appeal. Consideration of new issues first raised on the eve of oral argument would interfere with the orderly processing of appellate cases. For that reason, we decline to rule those issues on direct appeal, although we have examined the new contentions and see little merit in those that may be considered on the present record.

3. At least two of the bank employees told police after the robbery that one of the robbers spoke "like a black male." There was also conflicting testimony about the height of the robbers.

4. The vehicle's license plate number matched the description given by bank employees.

The getaway vehicle had been stolen from a supermarket parking lot about a week before the robbery. Ms. Bobbie Beliew, who lives in an apartment just north of the mall where the bank is situated, testified that an unfamiliar Jeep Wagoneer had been parked directly in front of her apartment for several days prior to December 2, 1983. On the date of the robbery, around 9:00 or 10:00 a.m., Beliew saw from her second story window a Datsun 280Z pull up beside the Wagoneer.[5] One man left the Datsun and entered the Wagoneer; both vehicles then drove off. Beliew made a rather dubious identification of Bruce Nabors as the man who moved from one to the other vehicle.[6]

Key testimony connecting the defendants to the bank robbery was provided by twelve-year old Tray Campbell, a nephew by marriage of John Nabors. Tray testified that he was alone at home ill on the morning of December 2, 1983, when both defendants arrived at his home around 10:45. Tray's home, at 935 Garland, is between 2.1 and 2.4 miles from the high school parking lot where the Wagoneer had been abandoned and a four to five minute drive from there. Tray testified that when he either heard someone enter the house or saw Bruce Nabors leaving a Datsun 280Z in the driveway, he called his mother. With his mother still on the line, Tray went down to the basement and peeked through the door. There he saw the two defendants laughing and giggling about an amount of money that they had gotten. A dryer that was normally placed against a crawl space door had been moved into the middle of the room. Tray returned to the telephone and informed his mother of the defendants' presence. She insisted that Tray get John Nabors to speak to her. Tray returned to the basement; when the defendants noticed him, John purportedly said, "Oh, shit, Tray's here." Bruce then left the house while John spoke to Tray's mother, Bennie Nicolo, on the telephone. According to Mrs. Nicolo, John informed her that he was killing time waiting for his wife to pick him up. He did not immediately leave the house as requested by Mrs. Nicolo. About twenty or thirty minutes later, Bruce returned to the house in a van with another man. Tray watched as both defendants carried some bags outside and put them in the van.

Later that afternoon, a police search of the Nicolo home uncovered in the crawl space a white sheet with a slit mark in the center, a brown pair of pants, a briefcase and a pair of boots. Richard Nicolo, Tray's stepfather, testified that none of these objects belonged to him and that no one has permission to store things in the crawl space. A footwear impression evidence expert with the F.B.I. linked the boots found in the Nicolo crawl space with the bank robbery. He expressed his opinion that the right boot made the print found near the abandoned get-away car "and that no other boot could have made the impression." The left boot also matched the physical dimensions of the print found on the teller counter although no positive identification could be made. It was the Government's theory that Bruce Nabors had worn the boots found at the Nicolo residence during the robbery and that his masked accomplice was his brother John.[7]

*Indictment Controversy*

During the Government's closing rebuttal argument, an unexplained difference between the signed indictment in the court file and the indictment in the possession of the defendants was discovered. Defend-

---

5. Bruce Nabors and his wife owned a Datsun 280Z.

6. Beliew's eyewitness identification was the subject of vigorous cross-examination. The jury was made aware that at a pre-trial hearing Beliew had chosen another person from a photographic spread and that at the initial identification procedure on the evening of the robbery she had selected both Bruce's photo and that of

another man, Clarence Franklin Moseby. Moseby was called as a defense witness and took the Fifth Amendment when asked whether he had committed the bank robbery.

7. The boots were within one-half size of Bruce Nabors' normal shoe size, and there was some testimony that he had worn similar boots.

ants had based part of their closing arguments on a poster of an indictment in which four overt acts were listed under the conspiracy count (count II). In rebuttal, the prosecutor spoke to the jury about a fifth overt act that was missing from defendants' poster. He informed the jury of the exact words of that missing overt act—"On or about December 2, 1983, John Calvin Nabors, Jr. and Charles Bruce Nabors went to a residence at 935 Garland, North Little Rock, Arkansas." A bench conference immediately ensued in which the existence of two different versions of count II was first discovered and discussed.

The certified indictments in the possession of the defendants lacked overt act number five. The certified indictment in the court file from which the prosecutor was reading to the jury did contain all five overt acts. Both indictments were marked as filed on the same day, May 22, 1984. Both defendants immediately moved for dismissal of the indictments and for mistrial based on this defect.[8] The Government could not explain (and cannot now explain) the difference in forms but contended that the error could be cured by merely striking overt act number five. The district court agreed with the Government. The prosecutor proceeded to apologize to the jury for the discrepancy; the trial court then gave a cautionary instruction—"I'm going to admonish you to disregard completely, wipe out of your minds that observation made by Mr. Neighbors pertaining to paragraph five of the overt acts referred to in count II of the Indictment." As part of the instructions later submitted to the

jury, a copy of count II without overt act number five was included.[9]

On appeal, defendants argue that the district court's action upon discovering differences in the indictments was reversible error because the striking of the fifth overt act constituted an improper amendment of an indictment and an insufficient means to cure obvious prejudice. Prejudice to defendants allegedly flows from the fact that the most probative evidence against them on the conspiracy charge is encompassed by overt act number five—the arrival at the Nicolo residence where Tray Campbell saw the defendants and where the boots were later found. It is defendants' contention that the defects described above mean that the notice function of the criminal indictment was not served and that it is impossible to determine on what basis the grand jury chose to charge defendants with conspiracy.

Although the general rule is that a court may not amend an indictment, an exception has been recognized where mere surplusage is eliminated ("merely a matter of form"), nothing is added to the indictment, and the remaining allegations state the essential elements of an offense. *United States v. Burnett*, 582 F.2d 436, 438 (8th Cir.1976). "Furthermore, a finding of prejudice to the defendant must be present before an amendment is held impermissible." *Id. See also United States v. Cook*, 745 F.2d 1311, 1316 (10th Cir. 1984).

We can discern no prejudice that could have resulted to the defendants from the unfortunate error in filing two different versions of the indictment.[10] First of all,

---

**8.** At oral argument, another slight variance between the two indictments was identified by counsel for John Nabors. The court file indictment provides in overt act number two, count II, that Charles Bruce Nabors drove the Jeep Wagoneer from the parking lot of "McCain Park Apartments" on the day of the robbery. The indictment served on the defendants has Bruce driving the vehicle from the parking lot of "McCain Mall."

**9.** At the close of the Government's case, the trial court had granted defendants' motion to strike overt act number one ("On or about November

27, 1983, a 1982 Jeep Wagoneer was stolen from 5400 Cantrell Road, Little Rock, Arkansas") from count II of the indictment. Although the court did not agree that there was insufficient evidence linking the car theft to the defendants' conspiracy to commit bank robbery, the motion was granted because the Government did not oppose it.

**10.** We note that the version of the indictment with all five overt acts was signed by both the grand jury foreperson and Government counsel, but that both signatures are missing from the four-overt act indictment, as supplied to us.

the evidence as to the fifth alleged overt act, the defendants' arrival at the Nicolo residence on the day of the bank robbery, was introduced without objection from the defendants. Defendants cannot claim surprise that crucial evidence was presented at trial concerning events encompassed by the fifth overt act. Moreover, count II stated an offense against both defendants even after overt act number five and number one were deleted by the trial court. A conspiracy to rob a particular bank on a particular date is described, with all of its essential elements, in both versions of the indictment. The discovery of the discrepancy during closing arguments clearly harmed the Government's credibility more than it prejudiced the defendants' right to a fair trial. The prosecutor's attempt to bring to the jury's attention defense counsel's allegedly deliberate failure to discuss overt act number five (and to include it in their poster of the indictment) boomeranged; it was the Government's litigation position that likely suffered when the prosecutor was compelled to apologize for the discrepancy in the indictments. Finally, that the prosecutor read from the five overt act indictment in his rebuttal argument is no ground for a claim of prejudice since evidence of the act itself was already before the jury and the version of the indictment subsequently submitted to the jury omitted that act.

 The decision of the trial judge to strike overt act number five when the variance in the indictment was brought to his attention was a proper one considering the lack of prejudice to the defendants and the sufficiency of the indictment as amended. The trial judge's action was somewhat analogous to not submitting one count of a multiple count indictment to the jury because of insufficiency of the proof. *See, e.g., Salinger v. United States*, 272 U.S. 542, 47 S.Ct. 173, 71 L.Ed. 398 (1926). The district court is permitted to narrow the charge of the indictment to conform to developments at trial. *See Burnett*, 582 F.2d at 438. Regardless of the order in which the two versions of the indictment were returned or certified, the five overt act version, because properly signed, carries with it a presumption of validity. *See Ward v. United States*, 694 F.2d 654, 658 (11th Cir.1983) ("An indictment regular on its face" is strongly presumed to be valid). By striking overt act number five, the district court was not altering the essential nature of the conspiracy charge, but was rather making a change in form to achieve consistency and to avoid a claim of inadequate notice. *Russell v. United States*, 369 U.S. 749, 770, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). "Where the indictment fairly specifies the offense charged and notifies the defendant of the particulars, the defendant has knowledge that other overt acts underlying the conspiracy might be pleaded at trial." *United States v. Lewis*, 759 F.2d 1316, 1344–1345 (8th Cir.1985). The Government's error in having two indictments certified, and the clerk's error in certification, although regrettably careless, were harmless ones once remedial action was properly taken by the trial court.[11]

---

**11.** The Supreme Court's very recent decision in *United States v. Miller*, — U.S. ——, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985) affirmed a conviction of mail fraud even though one theory of fraud, set out explicitly in the indictment (that defendant consented to the burglary of his business in advance) was not the subject of any proof offered at trial. It was defendant's position on appeal that because of the variance between the indictment and the trial evidence, his Fifth Amendment right to be tried on a grand jury indictment had been violated. The Court rejected the theory, adopted by the Ninth Circuit below, that "a grand jury's willingness to indict an individual for participation in a broad criminal plan does not establish that the same grand jury would have indicted the individual for participation in a substantially narrower, even if wholly included, criminal plan." The Court reviewed its prior interpretations of the Grand Jury Clause and concluded that "the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime." While the Grand Jury Clause does guarantee that a criminal defendant is not convicted for an offense not charged in the indictment, it is not an unconstitutional amendment "to drop from an indictment those allegations that are unnecessary to an offense that is clearly contained within it ..." Although the factual situa-

*Privilege Against Self-Incrimination*

Both defendants argue that statements made to the jury during closing argument constituted improper comments on defendants' failure to testify. During their respective closing arguments, counsel for both defendants attacked the credibility of twelve-year old Tray Campbell. By referring to inconsistencies in Tray's testimony and to a letter that Tray's mother had written years earlier expressing a concern about her son's veracity, defense counsel tried to paint Tray as a child with "a problem"—"what more can a little boy who needs self-glorification ask for than to be a star witness in a bank robbery case." Bruce Nabors' attorney emphasized to the jury that Tray was watching a movie about the Jesse James gang on television on the morning of the bank robbery. "... I think your imagination can just run wild with the sort of thing that might have suggested to that boy when he sees bank robbery and things like that when the police come over and interview him [Tray] later in the day." In response, the prosecutor in rebuttal acknowledged that Tray had experienced some problems in the distant past but asserted that they were now behind him. He then added,

> You know, after all their attacks on Tray Campbell, on his mother, on the bank employees, law enforcement in general, everybody, these lawyers still haven't explained to you how the boots that made the print right outside the getaway car, fresh print, ended up underneath that house [the Nicolo residence].

Defendants immediately moved for a mistrial on the ground that the statement constituted an indirect comment on their failure to testify because only the defendants themselves could have explained how the boots had gotten in the Nicolo crawl space. The Government attorney asserted at trial and on appeal that his statement was directed toward the theorizing of defendants' lawyers in their closing argu-

ments. The trial judge agreed and found that "Mr. Neighbors had reference to theories that you advanced during your closing argument." The prosecutor then addressed the jury again to clarify his previous remark—"So there will be no misunderstanding, what I am saying to you is that the lawyers for these two defendants have given you theories on how people are lying and fantasizing about transposing events seen in movies into real life situations and all of this ... The lawyers have given you their theories on that but they haven't given you their theories on where the boots came from that made the boot print."

■ Comment by a prosecutor on a defendant's failure to testify clearly violates the Fifth Amendment privilege against self-incrimination. *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). Allegedly indirect references are impermissible if they "(1) manifest the prosecutor's intention to call attention to the defendant's failure to testify, or (2) are such that the jury would naturally and necessarily take them as a comment on the defendant's failure to testify." *United States v. Durant,* 730 F.2d 1180, 1184 (8th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 149, 83 L.Ed.2d 87 (1984). "Both tests require attention to the context of the prosecutor's remarks—the argument itself, and the larger context of the evidence introduced at trial." *Id.*

■ Under either prong of the *Durant* holding, the Government's rebuttal argument in the present case does not cross the border of impermissible comment. In *Durant,* the comments were arguably more related to the defendant's failure to testify (i.e. repeated characterizations of an accomplice's testimony as "not substantially disputed," "unchallenged," and "not contradicted") than the comments here about the lack of explanation for the location of the boots. This court found no reversible error in *Durant* because the Government's re-

---

tion presented in *Miller* can be distinguished from the error committed by the prosecutor in the present case, in both cases the defendants

contended it was speculation whether the grand jury would have adopted the truncated indictment.

marks were essentially responsive to argument about the accomplice's testimony. Furthermore, it was concluded that the jury would not have "naturally and necessarily" viewed the prosecutor's statements as a comment on defendant's failure to testify in light of the obvious defense strategy of impeachment.

In the present case, the trial court determined that the prosecutor's remarks about the boots were intended to deflate defense counsel's theories about the child's testimony rather than to draw attention to defendants' failure to testify. We agree with that conclusion.

The presence of the boots in the crawl space was physical evidence that strongly confirmed certain portions of Tray's testimony. Defense counsel had offered possible motives or inducements for Tray to testify falsely; the prosecutor's remarks are perfectly consistent with an attempt to deal with this conjecture and rehabilitate the boy's character for truthfulness. "We cannot find that the prosecutor manifestly intended to comment on the defendant's failure to testify, if some other explanation for his remark is equally plausible." *United States v. Rochan,* 563 F.2d 1246, 1249 (5th Cir.1977).

For similar reasons, the jury would not have naturally and necessarily taken the Government attorney's statements as a comment on defendants' failure to testify. While it is true that a criminal defendant has no burden to explain anything, the Government is not precluded from arguing that the evidence presented to the jury is inconsistent with speculation or conjecture offered by defense counsel. While some juror might conceivably have viewed the prosecutor's remarks in the manner suggested by the defendants (although this seems unlikely), the test is one of whether the jury would necessarily or probably have done so. *See United States v. Johnson,* 563 F.2d 936, 942 (8th Cir.1977), *cert. denied,* 434 U.S. 1021, 98 S.Ct. 746, 54 L.Ed.2d 768 (1978), and *Williams v. Wainwright,* 673 F.2d 1182, 1184–85 (11th Cir. 1982). On a Fifth Amendment issue as attenuated as this one, the instruction of the court that defendants had no "burden or duty of calling any witnesses or producing any evidence" should have been adequate to remove any improper inferences from the minds of the jurors.

*Alleged Improper Questioning*

On direct examination of Tray Campbell, the Government's attorney asked the boy whether either of the defendants said anything immediately after they saw Tray for the first time in the Nicolo basement. The boy's initial reply was that John Nabors "turned around to his brother and said Tray's here." Counsel for John Nabors objected after the prosecutor continued this line of inquiry by asking, "Tray, exactly what did he say?" The trial court rejected the contention that the Government was asking improper leading questions and instead stated that "I think perhaps what he's doing is repeating what the witness has said essentially, and of course given the circumstances here which are quite obvious, the court is going to overrule the objection." The following inquiry then occurred:

Q. (Prosecutor) Tray, have you told me before what they said?

A. (Tray) Yes, sir.

Q. And what did you tell me that John said?

A. Can I say it?

Q. Yes, you can say it.

A. He said, he said, "Oh, shit, Tray's here."

Defendant characterizes this entire line of questioning as "an improper and extremely prejudicial method of interrogation of a child witness." We do not agree with this description. Although leading questions are not ordinarily permitted on direct examination except "as may be necessary to develop ... testimony," (Federal Rule of Evidence 611(c)), the Notes of the Advisory Committee describe a long-recognized exception—"the child witness or the adult with communication problems." In this case the prosecutor did not suggest the language used, although he did press for a

repetition of words previously used. Tray's hesitation in using a "naughty" word in a formal proceeding was understandable. The wording of that statement did tend to implicate the defendants in the bank robbery in that it indicated some alarm at being discovered; it was thus proper for the prosecutor to attempt to elicit its precise language. The trial court's ruling deserves deference because the court was in the best position to evaluate the emotional condition of the child witness and his hesitancy to testify. *See United States v. Iron Shell, Jr.,* 633 F.2d 77, 92 (8th Cir.1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981) (no error in allowing the Government to ask a nine-year old sexual assault victim leading questions). *Accord United States v. Rossbach* 701 F.2d 713, 718 (8th Cir. 1983).

*Severance*

John Nabors contends that he should have been granted a separate trial both because the evidence against his brother was stronger (and he would necessarily be thought to be connected with his brother's misdeeds) and because testimony of a witness called by his brother unduly prejudiced John's defense.

Defendants' final witness was Clarence Moseby, called by Bruce Nabors. Even before Moseby began his testimony, counsel for John Nabors objected to the calling of Moseby and moved again for a severance. John indicated that he desired to rest his case at this point in the trial. On direct examination by counsel for Bruce, Moseby invoked the Fifth Amendment when asked whether he had robbed the bank. On cross-examination, the prosecutor asked Moseby how long he had been acquainted with John Nabors. A lengthy bench conference then ensued during which John's attorney argued vigorously that allowing Moseby to answer this question, presumably by taking the Fifth Amendment, would prejudice his client by associating him with a man who had just implicated himself, practically speaking, in the robbery. The Government responded that the intent of the question was not to create an implication of guilt by association, but rather to establish that Moseby, because he knew both defendants, had a motive to take the Fifth Amendment in an effort to shield both Bruce and John. The prosecutor agreed to ask Moseby first about his acquaintanceship with Bruce. The trial court denied John Nabors' motion for severance and allowed the questioning of Moseby to continue. Moseby invoked the Fifth Amendment when asked whether he knew Bruce Nabors. After renewed objections from John's attorney, the court barred any further questioning of the witness since his lawyer was not present. Consequently, Moseby never responded to the question about his association with John Nabors.

The rules governing severance of trials for co-conspirators were recently reviewed in *United States v. Lee,* 743 F.2d 1240 (8th Cir.1984). Generally, persons charged in a conspiracy should be tried together, "particularly where proof of the charges against the defendants is based upon the same evidence and acts." A defendant must show real and clear prejudice rather than merely that "his chances for acquittal would have been better had he been tried separately." Denial of a severance motion is not reversible error unless great prejudice and an abuse of discretion are shown. *See also United States v. Krevsky,* 741 F.2d 1090, 1094 (8th Cir. 1984), *United States v. Singer,* 732 F.2d 631 (8th Cir.1984), *United States v. Miller,* 725 F.2d 462, 467 (8th Cir.1984), and *United States v. Burchinal,* 657 F.2d 985, 995 (8th Cir.), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 646, 70 L.Ed.2d 622 (1981).

Although we agree that the evidence against Bruce Nabors was stronger than that against his brother, that fact alone did not make it an abuse of discretion to deny a severance. Severance becomes necessary "where the proof is such that a jury could not be expected to compartmentalize the evidence as it relates to separate defendants." *United States v. Jackson,* 549 F.2d 517, 523 (8th Cir.), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379

(1977). The Government's proof here was not so extensive, complicated, or confusing that the jury would be unable to consider the guilt of the two defendants independently. The district court made efforts to identify that evidence probative only against Bruce. For example, instruction number 10 advised the jury that Ms. Beliew's identification testimony "is not to be considered by you in any way as evidence of the guilt of John Nabors."

Moseby's testimony does not demonstrate any prejudice to John Nabors, given that the witness never responded, by invoking the Fifth Amendment or otherwise, to the inquiry about his relationship with John.[12] Although the decision by Bruce Nabors' attorney to call Moseby to the stand may raise questions of propriety in light of his admission to the court that he thought that Moseby "would most likely take the Fifth," any implication that might arise from Moseby's responses on direct examination would tend to favor both defendants, or at least to raise the level of uncertainty as to the identity of the culprits. It was this possible implication that the Government tried to dispel in asking about Moseby's relationship with *each* defendant. Arguably, the calling of Moseby failed to help defendants, in light of the Government's cross-examination, but the tactic of counsel for the co-defendant did not create prejudice against John Nabors, requiring a severance.

### Omitted Jury Instruction

■ John Nabors contests the district court's refusal to give a requested jury instruction on guilt by association—that it would be improper to decide one defendant's guilt based upon his association with another person who is believed to be guilty. We conclude that the district court's instructions, when read together, adequately apprise the jury of its duty to consider the guilt of associates separately.

The trial court instructed the jury that "[e]ach offense, and the evidence pertaining to it, should be considered separately. The fact that you may find all or some of

the accused guilty or not guilty of one of the offenses charged should not control your verdict as to any other offense charged against any of the defendants." The jury was also instructed that the mere association of various persons "does not necessarily establish proof of the existence of a conspiracy." The eyewitness identification testimony of Bobbie Beliew was "not to be considered by you in any way as evidence of the guilt of John Nabors."

■ The adequacy of the jury instructions must be determined by an examination of all of the instructions given. *United States v. Poston*, 727 F.2d 734, 740 (8th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984). In the present case, the jury was sufficiently informed that it was deciding the guilt or innocence of two separate individuals on two separate counts. The district court was sensitive to possible prejudice resulting from the sibling relationship of the co-defendants, as demonstrated by the instruction on the eyewitness identification of Bruce Nabors. We cannot conclude that John Nabors' requested instruction was necessary for a fair resolution of his guilt or innocence, and, therefore, no error in its omission occurred.

### Sufficiency of the Evidence

Defendant John Nabors challenges the sufficiency of the evidence presented at trial linking him to the actual robbery of the bank. He suggests that the Government's strongest piece of physical evidence, the bootprint found near the getaway car, establishes, at most, his brother's participation in the crime and that no other evidence, direct or circumstantial, places John Nabors at the scene of the armed robbery.

■ In reviewing the sufficiency of evidence to support a guilty verdict, this court must view the evidence in the light most favorable to the Government, "and accept all reasonable inferences favorable to the Government that logically may be

---

**12.** The questioning was not in bad faith, know-

ing an objection would be sustained.

drawn from the evidence." *United States v. Hutchings*, 751· F.2d 230, 238 (8th Cir. 1984) *See also Klein v. United States*, 728 F.2d 1074, 1075 (8th Cir.1984), and *United States v. Richmond*, 700 F.2d 1183, 1189 (8th Cir.1983). The evidence need not exclude every reasonable hypothesis except guilt; the essential elements of the crime may be proven by circumstantial, as well as direct evidence. *United States v. Coronel-Quintana*, 752 F.2d 1284, 1292 (8th Cir. 1984).

 It is true that the evidence pointing to Bruce Nabors as the robber who leaped over the bank teller counter is stronger than the evidence that his brother was his accomplice in the bank. The Government's theory, after all, was that Bruce had worn the boots during the robbery that were later recovered at the Nicolo residence. In addition, the only probative eyewitness identification before or during the robbery was that of Bobbie Beliew, who implicated only Bruce Nabors.

Reasonable inferences that can be drawn from the testimony of Tray Campbell and his mother, however, support the guilty verdict against John Nabors. Only minutes after the robbery, John was seen with his brother in the basement of the Nicolo residence. The men were talking excitedly of money that they had received and both were apparently engaged in moving objects into the crawl space. Tray Campbell attributed to John Nabors an incriminating expletive when the brothers first learned of Tray's presence in the home. Mrs. Nicolo's testimony confirmed that John Nabors was present at her home shortly after the robbery. That John Nabors was with his brother only a short time after the bank robbery and was seen engaged in conversations and acts consistent with a scheme to hide the proceeds and instruments of the crime is circumstantial evidence that he

was a part of the criminal enterprise before and during the robbery.

Defendant argues that he had done business at the bank, and would likely have been recognized. His familiarity with the bank premises lends some credence, however, to the theory of his involvement in the robbery.

This court has repeatedly approved the giving of an instruction to the effect that the possession of property recently stolen, if not satisfactorily explained, "is ordinarily a circumstance from which a jury may reasonably draw the inference and find, in the light of surrounding circumstances shown by the evidence in the case, that the person in possession not only knew it was stolen property, but also *participated in some way in the theft* of the property." (Emphasis supplied.) *See United States v. Johnson*, 563 F.2d 936, 940–41 (8th Cir. 1977), *cert. denied*, 434 U.S. 1021, 98 S.Ct. 746, 54 L.Ed.2d 768 (1978) (instruction approved where defendant is charged with bank robbery); *United States v. Weis*, 675 F.2d 217, 218 (8th Cir.1982). *See also United States v. Harbin*, 585 F.2d 904 (8th Cir.1978).

In the present case, none of the stolen money was recovered. Tray Campbell, testified, however, that he saw both defendants carry bags outside (presumably, from the Nicolo basement) "and put them in the van," and his testimony regarding defendants' conversation is strong circumstantial evidence as to their possession of the fresh loot.

The guilt of John Nabors, under this theory of the case, is not dependent on his familial relationship with Bruce Nabors, but is inferred rather from his efforts with his brother to conceal stolen funds minutes after the bank robbery.[13] Viewed in the light most favorable to the Government,

13. It seems relatively settled by the case law that the inference is not deemed speculative, even without any more direct corroboration of earlier misconduct, when the possession is within minutes or "a few hours" of the initial crime, and there is evidence of attempted concealment of a large quantity of stolen property. *Cosby v.*

*Jones*, 682 F.2d 1373, 1382 (11th Cir.1982). Compare *United States v. Jones*, 418 F.2d 818 (8th Cir.1969) (insufficiency of evidence of participation in bank robbery when a day had elapsed between the robbery and the possession of "bait money").

the evidence was sufficient to support a verdict that John Nabors was also a prior participant and not merely an accessory after the fact.

Having reviewed and rejected all timely-raised grounds for appeal, we affirm the judgments as to both defendants.