**UNITED STATES of America,
Appellant,**

v.

**Lowell Lesley BREDELL, Appellee.**

**No. 88-1718.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 14, 1988.

Decided Sept. 5, 1989.

Michael A. Jones, Springfield, Mo., appellant.

G.H. Terando, Poplar Bluff, Mo., appellee.

Before FAGG and WOLLMAN, Circuit Judges, and WOODS,* District Judge.

WOLLMAN, Circuit Judge.

A jury found Lowell Lesley Bredell guilty of knowingly and intentionally manufacturing phenyl–2–propanone (P2P), knowingly and intentionally attempting to manufacture methamphetamine, and conspiracy to manufacture and possess with intent to distribute methamphetamine and P2P. The district court, however, granted Bredell's post-trial motion for judgment of acquittal. The government appeals, claiming that the evidence was sufficient to sustain the jury's verdict. We reverse and remand for reinstatement of the verdict and imposition of sentence.

A district court has very limited latitude in ruling upon a motion for judgment of acquittal.

> A motion for judgment of acquittal should be granted only where the evidence, viewed in the light most favorable to the government, is such that a reasonably minded jury must have a reasonable doubt as to the existence of any of the essential elements of the crime charged. * * * "The evidence need not exclude every reasonable hypothesis except guilt; the essential elements of the crime may be proven by circumstantial, as well as direct evidence."

*United States v. Mundt,* 846 F.2d 1157, 1158 (8th Cir.1988) (quoting *United States v. Nabors,* 762 F.2d 642, 653 (8th Cir.1985)). This standard of review applies both to appeals from the denial and the grant of a motion for judgment of acquittal. *Id.*

In ruling upon a motion for judgment of acquittal, the district court is not to weigh the evidence or assess the credibility of witnesses. *Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978). This narrowly-constricted power of review is in contrast to the district court's broad discretion in ruling upon a motion for new trial. *See, e.g., United States v. Mundt,* No. 88–5396 (8th Cir. July 6, 1989).

Viewed in the light most favorable to the government, the evidence established the following sequence of events.

Bredell was reared in California and lived there until 1972. In 1969, he acquired a piece of real estate in Richmond, California, for rental purposes. He rented the property to members of the Richmond Chapter of the Hells Angels Motorcycle Club (the Club) in 1970, and in 1971 entered into a contract for deed with the Club. As of December 8, 1987, Bredell continued to be the record owner of the property. The Richmond Chapter of the Club currently uses this property for its clubhouse.

In 1972, Bredell moved to a farm in Texas County, Missouri. In 1981, he sold the farm and moved to Poplar Bluff, Missouri. Bredell reacquired the farm in 1984 through a bankruptcy trustee sale, with the intention to resell it.

In March of 1985, William Roark, a member of the Richmond Chapter of the Club, telephoned Bredell concerning the Texas County farm. In early April 1985, Bredell rented the farmhouse on the premises to Vicki and Karsten Kargel, residents of the area. A week later Roark visited the farm. He and Bredell then agreed that Roark would lease the farm with the option of buying it.

Roark was not interested in the house on the farm but rather in the two hog farrowing sheds located on the property. After Roark's appearance at the farm, the Kargels observed that a large, padlocked gate had been erected across the road leading to the farrowing sheds, which were located some distance from the farmhouse. Bredell told Karsten Kargel that Roark was going to renovate the sheds for the purpose of using them as a recording studio and that Roark had requested that Bredell make the sheds habitable and that Bredell initiate and pay for electrical service.

Bredell opened an account in his own name with the local electricity coop and made monthly payments on the account.

---

* The HONORABLE HENRY WOODS, United States District Judge for the Eastern District of Arkansas, sitting by designation.

He did some of the renovations on the sheds himself, but he also hired a plumber, carpenters, and other workmen. Defendant did the electrical wiring, including the installation of an exhaust fan. Bredell's records showed that he had incurred expenses of $13,792.50 on behalf of Roark in renovating the sheds.

Bredell received $14,500 in money orders. In May of 1985, he received five money orders worth $1,000 each, which had been purchased by Alexandria Carasis, Roark's girlfriend. In June of 1985, Bredell received $1,500 in money orders purchased by Carasis, and in late February or early March of 1986, Bredell received $8,000 more in money orders purchased by Carasis. Some of the money orders were signed "Roark," some were signed "Wilson," and some were unsigned.

After some of the renovations were completed, three members and one associate of the Richmond Chapter of the Club arrived in Texas County. The evidence established that the members—Roark, Arthur Carasis, and Mark Davis—and their close associate, Lawrence Herrera, set up a clandestine lab for the production of P2P and methamphetamine in one of the sheds. On June 10, 1986, Carasis and Herrera were arrested in Springfield, Missouri, while transporting 41 pounds of methamphetamine. The clandestine lab was not discovered at that time. Soon afterward, Roark told Bredell that he was forfeiting the lease option. Roark and the other members of the Club then moved off the Texas County property.

In July 1986, Bredell and a friend went to the sheds in his friend's small red pickup to clean up the debris inside and around the sheds. Both men testified that there was no laboratory equipment present. Bredell admitted, however, that the large shed smelled of acid and that the walls were stained with an unknown substance. On one occasion, Bredell rented a small van to transport a refrigerator, washing machine, clothes dryer, and other furnishings from the sheds to his home. Bredell also cleaned around the sheds in December of 1986.

In early October 1986, Sergeant Carl D. Watson of the Missouri State Highway Patrol, along with two other law enforcement officers, entered the Bredell property in response to information concerning suspicious activity. Sergeant Watson, whose duties included investigating clandestine drug laboratories, discovered in an area near the farrowing sheds three empty fifty-five gallon metal barrels from which the labels and markings had been removed, along with two plastic jugs containing a liquid by-product of methamphetamine production. Located between the drums and the larger of the two sheds was a trash burning area, in which were found pieces of burned glassware of a type used in drug laboratories.

In the spring of 1987, Roark telephoned Bredell and said he wanted to rent the property again. Bredell testified that Roark paid him $3,000 in rent, plus $400 for electrical reimbursement.

On May 22, 1987, agents of the Missouri State Highway Patrol searched the sheds. They found a lab for the production of P2P and methamphetamine. The only person within the lab was Davis. Roark later drove onto the property, but sped away when he saw the patrol agents. Bredell was arrested in August of 1987.

Several witnesses who lived on or near the Texas County farm testified to Bredell's connection with the Club members and the clandestine lab. Several neighbors and workmen testified that Bredell had introduced Roark to them as the new owner of the farm. Vicki Kargel testified that she saw Herrera with Bredell on two occasions. A plumber who worked on the sheds testified that Bredell had introduced him to Herrera. Karsten Kargel testified that in the spring of 1986 he saw Bredell driving a rental van on a road that led from the county road to the sheds and was guarded by a locked gate. A neighbor testified that on November 7, 1986, he saw a person who looked like Bredell drive a U-Haul truck to the locked gate, get out of the truck, unlock the gate, and proceed to the sheds. He also testified that twice, in December of 1986 and April of 1987, he

saw a small red pickup enter through the gate. On one occasion, he saw that Bredell was one of two men in the vehicle.

A Drug Enforcement Administration (DEA) agent with some two years' experience with the DEA's clandestine drug laboratory task force in San Francisco testified regarding the nature of the Hells Angels Motorcycle Club and the Club's involvement in the illegal manufacturing of methamphetamine. He testified that the Club is a tightly knit, highly organized organization that uses prospective members and trusted associates to carry out its criminal activities. He testified that "I would say that whenever we deal with methamphetamine labs, almost exclusively, there's reference somewhere down the line to Hell's Angels." Transcript at 192. He further testified to the effect that because of the DEA's vigorous search for illegal drug laboratories in northern California, the Club was moving from the West Coast to more rural areas in the Midwest in order to conceal its clandestine laboratories.

Anthony Tait, who became a member of the Hells Angels Motorcycle Club in 1983 and served as an officer on the local, west coast, and national levels, testified as a cooperating witness for the FBI. Tait stated that the Club, which he stated is one of the largest manufacturers of methamphetamine in the world, generally sets up its clandestine laboratories in rural areas. The laboratories emit a strong, distinctive odor and therefore must be remote from any close neighbors. The Club rarely purchases property for its laboratories, but instead rents it from others or simply moves onto property without the owner's awareness. If the Club rents the property, it will not deal with strangers. Tait testified that "[t]he owner of the property would have to be a trusted person, well known to them and [have] had specific dealings with them in an illegal manner before they would even consider even having anything to do with them on that kind of a basis." Transcript at 286. Tait admitted that in his contact with the Richmond Club members he had never met nor heard of Bredell.

The evidence showed that Bredell telephoned two numbers connected to members of the Richmond Chapter of the Club on fifteen occasions between March of 1985 and May of 1987. Bredell testified that all of the calls, most of which lasted no longer than one minute, were related to tardy rental payments and final sale of the Richmond, California, property. Bredell admitted on cross-examination, however, that nine of the fifteen calls that he made were made at times when the payments on the property were current. The telephone numbers were registered to Michael "Rooster" King, who was in charge of the purchase of the Richmond property, and to Art's Cafe, which was owned by Arthur Carasis.

When Bredell was initially interviewed by agents of the Missouri State Highway Patrol, he said that the man who had rented his property told him (Bredell) that his name was "Wilson." In a later interview Bredell explained that Roark had used both names. Bredell also understated the amount of money paid to him. He said that Roark had paid him a total of $6,000 in cash and money orders.

After Bredell was arrested, a Drug Enforcement Administration agent took him to a magistrate's courtroom in Springfield, Missouri. The agent testified that when they entered the courtroom, Bredell asked if it was a courtroom in which he could plead guilty.

In granting Bredell's motion for judgment of acquittal, the district court stated that it found that there was no real evidence against Bredell but rather that the government had exploited the stereotypical image of the Hells Angels Motorcycle Club, had attempted to establish guilt by association, and had overwhelmed the jury by the appearance of "substance by 'quantitative illusion.'" Order at 4.

The district court was primarily concerned about the government's proof regarding Bredell's "knowing participation." The standard for granting a judgment of acquittal, however, is whether a reasonably minded jury must have had a reasonable

doubt as to Bredell's knowing participation. *See Mundt,* 846 F.2d at 1158.

 The jury was not required to believe that Bredell was a wide-eyed naif in his dealings with Roark, Carasis, Davis, and Herrera. His participation in renovating the sheds and his interaction with Roark and his colleagues went well beyond that of an ordinary lessor. He telephoned members of the Club in California on numerous occasions and had access to the sheds through the locked gate that excluded all others from entering the property where the laboratory was located. His professed belief that members of the Richmond, California, Chapter of the Hells Angels would travel half way across the continent to south-central Missouri, pleasantly bucolic though the locale might be, there to set up a recording studio in a hog farrowing shed, might well have strained the credulity of the most reasonably minded jury. It was for the jury to accept or reject the DEA agent's testimony regarding the pervasive presence of the Hells Angels in the operation of clandestine drug laboratories, as well as Tait's testimony that the Hells Angels rent only from persons they trust and with whom they have had a history of interaction. That testimony accepted, Bredell's past dealings with the Club, his extensive activities in renovating the farrowing sheds in accordance with Roark's directions, his close contacts with the members of the Club during the relevant times in question, and his numerous contacts with the accoutrements of the drug lab belie his professed ignorance of the use to which the buildings were being put and stand as competent evidence from which the jury could rightfully find that Bredell had knowingly participated in the crimes with which he was charged. Likewise, the jury could properly draw inferences of Bredell's guilt from his prevarications regarding Roark's name and the amount of money he received from Roark, as well as from his statement regarding the opportunity of entering a guilty plea. Given this evidence, we cannot say that a reasonably minded jury must have had a reasonable doubt as to Bredell's guilt.

We reverse the judgment of acquittal and remand for reinstatement of the verdict and imposition of sentence.