**UNITED STATES of America, Appellee and Cross–Appellant,**

v.

**James BENNETT, Appellant and Cross–Appellee.**

**Nos. 91–2010, 91–2169.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1991.

Decided Feb. 25, 1992.

John R. Wylde, Jr., Minneapolis, Minn., for appellant/cross-appellee.

Douglas Ray Peterson, Minneapolis, Minn., argued (Thomas B. Heffelfinger, on brief), for appellee/cross-appellant.

Before LAY *, Chief Judge, ARNOLD **, Circuit Judge and STUART ***, Senior District Judge.

* The Hon. Donald P. Lay was Chief Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted and took senior status on January 7, 1992, before the opinion was filed.

** The Hon. Richard S. Arnold became Chief Judge of the United States Court of Appeals for the Eighth Circuit on January 7, 1992.

*** The Hon. W.C. Stuart, Senior United States District Judge for the Southern District of Iowa, sitting by designation.

STUART, Senior District Judge.

A jury found the defendant, James Bennett, guilty of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (Count I); use of a firearm during and relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c) (Count II); and cocaine conspiracy in violation of 21 U.S.C. § 846 (Count III). The trial court reserved ruling on defendant's motion for judgment of acquittal on the conspiracy count. On the day of sentencing he granted that motion and sentenced Bennett to a 57 month term on Count I and a consecutive 60 month term on Count II with a special assessment of $100 and a five year term of supervised release.

The defendant appealed alleging (1) that the evidence on Counts I and II was insufficient to sustain the convictions; (2) that the Court's restrictions on the defendant's cross-examination of an officer regarding the reliability of an informant violated his rights under the Fifth and Sixth Amendments to the United States Constitution; and (3) that he is entitled to a new trial free of evidence from an alleged co-conspirator because the trial court ruled that there was insufficient evidence to sustain a conviction on the conspiracy count.

The government cross-appealed claiming that the trial court erred in granting a judgment of acquittal on Count III and that the case should be remanded for reinstatement of the verdict and resentencing.

We affirm on the defendant's appeal and reverse on the government's appeal.

A judgment entered upon guilty verdicts of the jury "must be upheld if, viewing the evidence in the light most favorable to the government and giving the government the benefit of all reasonable inferences, we conclude that a reasonable fact-finder could have found guilt beyond a reasonable doubt." *United States v. Maejia,* 928 F.2d 810, 812 (8th Cir.1991). After a thorough review of the record, we summarize the evidence in the light most favorable to the government and the jury verdict of guilty as follows.

## FACTS

This cocaine investigation began with an informant known as "Yeager" arranging for the purchase of cocaine from Mercelle Burkhalter on November 9, 1989. Burkhalter, driving a Volvo, arrived at a Target parking lot in North Minneapolis at the appointed hour of 4:00 p.m.

After a brief meeting with the informant, Burkhalter drove by herself directly to West Broadway. The surveillance officers, planning to follow her to her source, watched her stop at 2044 Broadway and then spend a considerable amount of time in a barber shop down the street where defendant, James "Dickie" Bennett, claimed to work as the "Shoe Shine King." Burkhalter left the barber shop at 4:25 p.m., picked up the informant, and drove directly to 4050 Lyndale Avenue North, the building where Bennett maintains apartment 101. Burkhalter parked in the rear of the building and went in the back door.

Surveillance officers next observed Burkhalter and Grady Moss step out of apartment 101 into the building hallway. While they were talking outside of the open apartment door, they noticed Officer Peter Jackson looking at them through the building's front glass door. The buzzer on the security system near Officer Jackson went off and Moss came down and turned it off. He went back up and continued to talk to Burkhalter. After Burkhalter and Moss reentered apartment 101, Officers Jackson and Michael Strauss noticed someone looking out of the apartment window. Neither officer could tell who that person was.

Minutes later, Burkhalter left through the building's rear entrance and rejoined the informant in her Volvo. By removing his hat—a pre-arranged signal—the informant alerted the surveillance officers that Burkhalter had obtained the cocaine. Officers followed Burkhalter's Volvo to an intersection near West Broadway. A number of undercover officers and uniformed officers stopped Burkhalter at around 4:55 p.m. Burkhalter had a brown paper bag filled with cocaine stuffed in her pants. One inner package contained seven baggies of cocaine totalling 195.7 grams at a

strength of 84%. This quantity corresponded with a seven ounce drug sale reflected in handwritten notes found later in apartment 101. Another inner package contained 14.67 grams of cocaine at a strength of 80% in two baggies. Burkhalter's coin purse also contained 2.76 grams of crack cocaine at a strength of 89%.

While Burkhalter was being followed, two narcotics officers moved into the alley back of 4050 Lyndale. At approximately 4:57 p.m., Officers Dunn and Hancock met Grady Moss who was driving out of the alley in his white Oldsmobile. They arrested Moss, searched his car and found a pager, $350 in cash, and a set of keys.

Meanwhile, Burkhalter alarmed the arresting officers when she yelled something to a passerby at the West Broadway arrest site. In response, some of the officers moved back to the 4050 Lyndale Avenue North apartment location to protect their plans to execute a search warrant. A police intern, riding in one of the returning undercover vehicles, spotted someone looking out the window for a second time. Llewellyn McGary was also seen sprinting up to the apartment building at around 5:10 p.m. Upon arriving at the building, McGary used the buzzer and was let into apartment 101. McGary departed quickly, but found himself under arrest in the front of the building at 5:12 p.m. A search of McGary revealed nothing of significance— no pagers, no cash, no keys. While arresting McGary, two officers saw someone look out of the apartment window for a third time.

At that point, Officer Jackson moved back to his surveillance location at the glass front door of the building. It was nightfall and the lights were on in the apartment building hallway. At approximately 5:15 p.m., Officer Jackson saw a person, later identified as Bennett, leaving apartment 101. Before departing down the hall, Bennett used a key to lock the apartment door.

Officers Dunn and Hancock, with the police intern watching nearby, were at the rear apartment door trying the keys obtained from Grady Moss. The Moss keys did not work. While the officers were trying the keys, Bennett came down the hallway toward the back door. Bennett let the officers in the building. They did not know that he had been in apartment 101. Later that day one of the officers, as well as the police intern, identified Bennett as the person who came out the back door. The police intern observed Bennett get into another Oldsmobile, this one bearing license number 325 CLT. The government proved that the automobile was registered to Jacqueline Freeman, the same name linked to a pager seized from Bennett on September 15, 1990, and a pager seized from Bennett when arrested on September 20, 1990.

The officers on the scene immediately knocked on the door of apartment 101. When no one responded, they kicked the door in and entered to secure the apartment. No one was found inside. A search warrant was obtained. The searching officers discovered a one-bedroom apartment with a living area and kitchen. The refrigerator contained some fast food, over 125 grams of 80% strength cocaine in the crisper, and $2,700 of United States currency in its butter dish. The kitchen cabinets near the stove contained various cocaine quantities packaged in paper bags and ziplock bags, like the cocaine found on Burkhalter. The photographs of the kitchen cabinets showed that they contained little besides one set of baggies with 55.75 grams of 83% cocaine, a second set with 111.35 grams of 87% strength cocaine, a third set with 83.79 grams of 84% strength cocaine, and a fourth set with 6.87 grams of 75% strength cocaine. One of the cabinets also contained a gram scale.

In the bedroom was a walk-in closet containing some men's clothes and men's shoes. On a shelf in the closet, the searching officers found a shoe box containing a .41 magnum revolver loaded with hollow point bullets. The closet was near a bed and a dresser. The dresser, positioned between the bed and closet, contained approximately $675 in cash.

Documents found in the apartment included: Bennett's lease covering November 1989; a US West phone bill in his name

covering November 1989; a Star Tribune newspaper bill in his name; a photograph of Bennett; a Northern States Power Company bill in his name; money orders and rent receipts in defendant's name and in the name of Jacqueline Freeman; James Bennett's birth certificate; a Globe Cleaners receipt for "Dick", the defendant's alias; and a car rental agreement in Bennett's name. Next to the documents the officers also found a pager registered to Judy Schleismann. Schleismann testified that she obtained the pager for the defendant, whom she knew as "Dick Callahan". He would pay her in cash to cover the pager bills.

While the officers were executing the search warrant, numerous phone calls came in. Officer Michael Fossum talked to two of the callers. The first one asked for "Dickie" and ordered one and one-half ounces of cocaine. The second caller identified herself as "Pookie", asked for "Dickie", and ordered one-half ounce of cocaine. Notes were found in the apartment which mentioned "Pookie" and her phone number. Besides the notes corresponding to the seven ounces of cocaine seized on Burkhalter, other notes were found. An expert testified that they reflected one to three ounce cocaine deals, with one note showing dollar figures totalling $89,600.

A cooperating witness, Torvell Herron, testified against Bennett. Herron lived next to Bennett at 4046 Lyndale Avenue North in November of 1989. Herron testified that he had purchased cocaine from "Dickie" around five or six times at Bennett's 4050 Lyndale Avenue North apartment. In addition, Herron purchased cocaine on approximately 15 other occasions, identifying Jerseys Bar as one of the three other purchase locations. Significantly, Judy Schleismann indicated in her testimony that she also met Bennett at Jerseys. Herron identified the firearm found in the closet as the gun he sold to Bennett for approximately $350 worth of cocaine. Herron testified that Bennett stated that the gun was "not for a boy" at the time of the trade. Herron expressed the opinion that Bennett would use the weapon to "protect himself." Bennett often bragged to Herron about how he had evaded the searching police. Bennett commented to Herron about some of the details of the search, including his looking out of the window when a confederate was under arrest and the two white officers' attempt to enter the back door with keys. Bennett also asked Herron to check the apartment vicinity to make sure the police were not on watch.

On September 15, 1990, Bennett was stopped for driving under the influence on the expressway in North Minneapolis. At that time, Bennett's car contained a police scanner tuned to the Minneapolis frequency. A search of his person revealed a pager (registered to Jacqueline Freeman), $1,328 in cash, a gold watch, and a cellular phone.

While making a court appearance connected with the September 15 traffic stop, Bennett was arrested on the outstanding federal indictment. He was found with $500 in $20 bills, another pager registered to Jacqueline Freeman, and his Shoe Shine King business card for the West Broadway address where Burkhalter first went on November 9.

For some reason or reasons, Burkhalter, Moss and McGary did not testify at the trial and charges against them, if any, were dropped. Only Bennett was prosecuted in connection with the incidents involved here.

From the foregoing evidence, a reasonable fact-finder could infer that Burkhalter, after conferring with Yaeger, the person she thought wanted to purchase cocaine, went to the barber shop to meet Bennett. As he was not there, she found out where he was and went back and picked up Yaeger and drove to Bennett's apartment building. She went into Bennett's apartment (101) and came out with the cocaine she had when she was arrested. As McGary was the only one to enter and leave apartment 101 after Burkhalter had been there and before the defendant left, a reasonable fact-finder could infer that Bennett was in the apartment all of the time and that he was the one who looked out the

window and delivered the cocaine to Burkhalter.

## Government's Cross–Appeal

As some of appellant's arguments rely upon the trial court's granting of his motion for judgment of acquittal on Count III, we will rule upon the government's cross-appeal first. The question is whether there was sufficient evidence to support the jury's verdict of guilty on the conspiracy count. The trial court determined that there was insufficient evidence of a conspiracy among the defendant and others and that there was an absence of concrete proof of any joint agreement to possess cocaine with intent to distribute.

A district court has very limited latitude in ruling upon a motion for judgment of acquittal.

A motion for judgment of acquittal should be granted only where the evidence, viewed in the light most favorable to the government, is such that a reasonably minded jury must have a reasonable doubt as to the existence of any of the essential elements of the crime charged. * * * "The evidence need not exclude every reasonable hypothesis except guilt; the essential elements of the crime may be proven by circumstantial, as well as direct evidence."

*United States v. Mundt,* 846 F.2d 1157, 1158 (8th Cir.1988) (quoting *United States v. Nabors,* 762 F.2d 642, 653 (8th Cir.1985)). This standard of review applies both to appeals from the denial and the grant of a motion for judgment of acquittal. *Id.*

In ruling upon a motion for judgment of acquittal, the district court is not to weigh the evidence or assess the credibility of witnesses. *Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978). This narrowly-constricted power of review is in contrast to the district court's broad discretion in ruling upon a motion for new trial. *See, e.g. United States v. Mundt,* No. 88–5396 [889 F.2d 1091 (table) ] (8th Cir. July 6, 1989).

*U.S. v. Bredell,* 884 F.2d 1081, 1082 (8th Cir.1989).

To convict a defendant of conspiracy under 21 U.S.C. § 846, the government must prove:

that he entered into an agreement with at least one other person and that the agreement had as its objective a violation of the law. *Henderson v. United States,* 815 F.2d 1189, 1191 (8th Cir.1987). Section 846 does not require proof of an overt act in furtherance of the conspiracy. *United States v. Covos,* 872 F.2d 805, 810 (8th Cir.), *cert. denied,* [493 U.S. 840], 110 S.Ct. 124, 107 L.Ed.2d 85 (1989). "The independent evidence showing a conspiracy may be direct or totally circumstantial." *United States v. Jankowski,* 713 F.2d 394, 396 (8th Cir.1983), *cert. denied,* 464 U.S. 1051, 104 S.Ct. 732, 79 L.Ed.2d 192 (1984). "The nature of the offense of conspiracy with its necessary aspect of secrecy often requires that the agreement be implied from the surrounding circumstances." *United States v. Gooden,* 892 F.2d 725, 729 (8th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 2594, 110 L.Ed.2d 274 (1990).

*United States v. Maejia,* 928 F.2d 810, 813 (8th Cir.1991).

The evidence presented in this case and the reasonable inferences arising therefrom are not such that a reasonably minded jury would have had to have reasonable doubt about any of the elements of the crime of conspiracy. There was evidence to support a finding that in Bennett's apartment he delivered seven ounces of cocaine to Burkhalter and still had several ounces of cocaine left. Herron testified he bought cocaine from Bennett 15 to 20 times for resale. The jury is permitted to consider the size of the transaction in determining whether a scheme to distribute drugs existed. *United States v. Boone,* 641 F.2d 609, 611 (8th Cir.), *cert. denied,* 454 U.S. 831, 102 S.Ct. 129, 70 L.Ed.2d 109 (1981); *United States v. Blake,* 484 F.2d 50, 58 (8th Cir.1973), *cert. denied,* 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 669 (1974). There was sufficient circumstantial evidence to support a finding by the jury that there

was an agreement between the defendant and others to achieve some illegal purpose. *See United States v. Thomas,* 768 F.2d 611, 614–15 (5th Cir.1985); *United States v. Hoelscher,* 764 F.2d 491, 494 (8th Cir. 1985); *United States v. Harrell,* 737 F.2d 971, 980 (11th Cir.1984) *cert. denied,* 470 U.S. 1027, 105 S.Ct. 1392, 84 L.Ed.2d 781 (1985); *United States v. Jankowski,* 713 F.2d 394, 396–97 (8th Cir.1983), *cert. denied,* 464 U.S. 1051, 104 S.Ct. 732, 79 L.Ed.2d 192 (1984).

We hold that the trial court erred in granting the defendant's motion for judgment of acquittal on Count III. The case must be remanded to the trial court for reinstatement of the jury verdict on Count III and resentencing.

### Defendant's Appeal

#### a.

■ Bennett argues that there was insufficient evidence introduced to support the jury verdict of guilty on Count I, possession of cocaine with intent to distribute. In order to have convicted Bennett of violation of 21 U.S.C. § 841(a)(1), the government must have proved beyond a reasonable doubt that he knowingly possessed cocaine with intent to distribute it. Under the evidence set out above and the reasonable inferences arising from that evidence, a reasonable jury could have found Bennett guilty beyond a reasonable doubt of the crime charged in Count I. The judgment entered on the jury verdict in Count I is affirmed.

#### b.

■ Bennett also argues that there was insufficient evidence introduced to support the jury verdict of guilty on Count II, the gun charge. In order to have convicted Bennett of violation of 18 U.S.C. § 924(c), the government must have proved beyond a reasonable doubt that he committed the crime charged in Count I and that during and in relation to the commission of that crime he knowingly used or carried a firearm.

■ The gun charge involves one .41 magnum revolver loaded with hollow point bullets found in a shoe box on the shelf in the bedroom's walk-in closet in this small apartment. A dresser between the closet and the bed contained approximately $675. No drugs or drug paraphernalia were found in the bedroom. All of the drugs, paraphernalia and $2700 cash were found in the kitchen end of the living area. The apartment contained some men's clothing but it was not equipped as a full time residence. Bennett gave a Chicago address as his home. There is evidence that drug transactions took place in the apartment. The jury could infer that this was a drug house. In spite of appellant's statement to the contrary, there was evidence in the case from which the jury could infer that Bennett was present when Burkhalter was in the apartment.

In arguing that the evidence is insufficient to establish that the gun was used in relation to a drug trafficking offense, the appellant relies primarily on the Second Circuit case of *United States v. Feliz–Cordero,* 859 F.2d 250 (2d Cir.1988). However, the Eighth Circuit has never accepted or rejected that standard, but has utilized the standard set forth in *United States v. LaGuardia,* 774 F.2d 317 (8th Cir.1985). *See United States v. Freisinger,* 937 F.2d 383, 387 (8th Cir.1991); *United States v. Curry,* 911 F.2d 72, 79–80 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 980, 112 L.Ed.2d 1065 (1991); *United States v. Lyman,* 892 F.2d 751, 752–754 (8th Cir. 1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 45, 112 L.Ed.2d 21 (1990).

In *LaGuardia* this court said "Section 924(c)(1) reaches the possession of a firearm which in any manner facilitates the execution of a felony." 774 F.2d at 321. In that case $10,000 and 18 ounces of almost pure cocaine were found in an apartment. A .22 caliber pistol fully loaded with hollow point bullets and a large pocket knife were found in a purse on the bed in the bedroom. A bag containing 17 ounces of 96 percent pure cocaine was stuffed in the leg of a pair of pants hanging in the bedroom closet. A loaded nine millimeter pistol was found on the shelf in a hallway

closet. Ammunition for both weapons was on a shelf in the bedroom closet. A .44 caliber rifle was found in the trunk of LaGuardia's car. More cocaine and drug paraphernalia were found in the common areas of the bedroom and kitchen. The defendants were in the apartment when the search took place. We said: "The weapons had undoubted utility in the protection of the valuable supply and of the cash on hand. The presence and availability in light of the evident need demonstrates the use of the firearm to commit a felony. The evidence of the weapons, found in connection with the cocaine and cash, was sufficient to support the submission of the firearms charge to the jury." *LaGuardia*, 774 F.2d at 321.

In *United States v. Drew*, 894 F.2d 965, 968 (8th Cir.), *cert. denied*, 494 U.S. 1089, 110 S.Ct. 1830, 108 L.Ed.2d 959 (1990), where the claims were different, we stated:

> Noting the need of drug dealers for guns to protect their operations, this Court has made clear on several occasions that the mere presence and ready availability of a firearm at a house where drugs are dealt constitutes the "use" of a gun during a narcotics offense. *See, e.g. United States v. Brett*, 872 F.2d 1365, 1370–71 (8th Cir.), *cert. denied*, [493 U.S. 932], 110 S.Ct. 322, 107 L.Ed.2d 312 (1989).

In *Curry* we stated that its facts presented a much closer question than those in any of our previous cases affirming convictions under § 924(c)(1). *Curry*, 911 F.2d at 80. The evidence here viewed in the light most favorable to the government presents a closer question than *Curry*. However, the evidence and reasonable inferences therefrom support a finding that a loaded handgun was found in Bennett's small apartment where substantial quantities of drugs and amounts of money were located and that the apartment was used for drug transactions. This evidence is sufficient to raise a factual issue for the jury to determine whether Bennett "used" a firearm during or in relation to the possession of cocaine with intent to distribute it.

c.

Defendant claims that he is entitled to a new trial because the trial court's restrictions on his cross-examination of Officer Billings violated his constitutional rights to confront a witness under the Fifth and Sixth Amendments to the Constitution of the United States. Defendant sought to elicit on cross-examination of Billings the fact that subsequent to the search, but before the arrest of Herron, the police discovered that Yeager was not reliable and was engaged in the drug business using police compensation to acquire his inventory. The trial court only allowed defendant to establish that an incident had occurred in February 1990 which caused police to question Yeager's reliability.

Yeager was not a witness in this case and acted only as a purchaser of cocaine from Burkhalter. What the defendant was attempting to do was to develop a connection between the emergence of Herron as an informant to replace Yeager so that he could argue that Herron was not credible as an informant and that Yeager's lack of credibility provided a motive "for police susceptibility to [Herron's] blandishments to present suspect testimony against Bennett." Counsel for Bennett states that he could have argued from this evidence that "it was Yeager who was engaged in a sinister cabal with Burkhalter and others to distribute drugs. This would explain the presence of the excess amount of drugs in the Burkhalter vehicle * * *, the circuitous route on which Yeager and Burkhalter [led] the surveilling police officers and the planting of the seed in the mind of Officer Billings and others that the 'source' would be at the Lyndale Avenue address."

The Sixth Amendment to the United States Constitution guarantees a defendant the right to confront and cross-examine witnesses against him. *United States v. Wilson*, 787 F.2d 375, 386–87 (8th Cir.), *cert. denied*, 479 U.S. 857, 107 S.Ct. 197, 93 L.Ed.2d 129 (1986). The Confrontation Clause gives the defendant the opportunity to cross-examine a witness, but trial judges "retain a wide latitude insofar as the Con-

frontation Clause is concerned to impose reasonable limits" on cross-examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). A trial court's limitation of cross-examination will not be reversed without a clear abuse of discretion and a showing of prejudice to the defendant. *United States v. Lee*, 743 F.2d 1240, 1249 (8th Cir.1984).

■ The trial court did not abuse its discretion in restricting Bennett's cross-examination of Officer Billings. Events after the search involved here disclosed Yeager's unreliability. However, in this case, he had no connection to or contacts with Bennett. He sat in Burkhalter's car while she entered apartment 101. He was with her when she was arrested. She, rather than Yeager, had the cocaine. At most Yeager could have provided cumulative evidence on matters that were not seriously contested.

There was no showing of any contacts between Herron and Yeager. Defendant sought to cross-examine a police officer relating to the credibility of an informant who was not a witness in this case in an effort to challenge the credibility of Herron who had nothing to do with the drug transaction at issue in this case. Defendant was given wide latitude in his effort to impeach Herron's testimony.

The trial court was well within his discretion in restricting the cross-examination of Officer Billings.

#### d.

Appellant argues that he is entitled to a new trial "free of the tainted evidence elicited by the government from alleged co-conspirator when the trial court ultimately concluded that there was insufficient evidence of a conspiracy to justify a conviction."

As we have held that the conviction on the conspiracy count should be reinstated, we need not address this issue. Herron's testimony as a co-conspirator would be admissible against defendant.

For the reasons heretofore stated, we affirm the trial court on the defendant's appeal and reverse the trial court on the

government's appeal. The case is remanded to the district court for reinstatement of the conviction on Count III and resentencing.