UNITED STATES of America,
Plaintiff,

v.

Aurelio J. ORTIZ, Jr., Sarah Ann Kozak, and Ramiro Astello, Defendants.

No. CR–97–3008–MWB.

United States District Court,
N.D. Iowa,
Central Division.

March 23, 1999.

Janet Papenthien, Robert Teig, Assistant United States Attorneys, Sioux City, IA, for plaintiff.

Robert Sikma, Sioux City, IA, Martha McMinn, Sioux City, IA, for Defendant Ortiz.

Stanley Munger, Sioux City, IA, Jennifer Bicknese, Iowa Falls, IA, for Defendant Kozak.

Thomas O'Flaherty, Swisher, Iowa, Donald Fiedler, Omaha, NE, for Defendant Astello.

### MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' POST–TRIAL MOTIONS

BENNETT, District Judge.

## TABLE OF CONTENTS

I. BACKGROUND ...................................................1076

II. LEGAL ANALYSIS ..............................................1078
 A. The Motions For Judgment Of Acquittal ...............1078
 1. Standards applicable to motions for judgment of acquittal ...........1078
 2. Sufficiency of the evidence ........................................1079
 B. The Motions For New Trial ............................................1081
 1. Standards applicable to motions for new trial.......................1082
 2. Weight of the evidence..........................................1083
 a. Astello..........................................................1083
 b. Ortiz and Kozak .............................................1083

III. CONCLUSION ...................................................1086

In the early morning hours of June 7, 1997, Gregory Sky Erickson, a fifteen-year old boy from Estherville, Iowa, was brutally shot and murdered—execution style—in the darkness of an abandoned and isolated farmhouse basement in southern Minnesota. Sky was kidnapped from Iowa where he was gagged, bound, blindfolded, savagely beaten, and transported in the trunk of a car to face his horrific death. Sky's senseless murder was triggered by an $800.00 drug debt and the actions of "friends"—some drug-crazed by methamphetamine. These facts are unassailable. However, assigning individual criminal responsibility for Sky's death has proven to be a complex and daunting task—complicated by the dramatically varying degrees of the defendants' involvement and by the sequence of events spanning two days, two Iowa cities, and two states.

Nearly two years have passed since the tragic events that gave rise to this criminal case. Since then, ten defendants—ranging in age from sixteen to twenty-seven—have been charged in this court with various crimes arising from Sky's murder. At the government's request, the federal charges brought against three juvenile defendants were ultimately dismissed. The juveniles were subsequently convicted on state charges—one of the juveniles pled guilty, and the other two were found guilty following jury trials.

The remaining seven young adult defendants were indicted in this court. The government originally sought the rarely invoked federal death penalty against these defendants. However, late in the pre-trial proceedings, the government withdrew its request after the "ring-leader" and most culpable defendant—Luis Lua—pled guilty to the charges against him in exchange for a mandatory life sentence. Of the six remaining defendants, one has fled the country and remains at large. Two others have also pled guilty in this court, and three proceeded to trial. Countless motions and court orders have been filed—indeed, this ruling will be the 703rd filing in this case.

Last July, I presided over a lengthy—and at times emotionally draining—trial of the three remaining defendants. At the trial's conclusion, the jury returned guilty verdicts against all three—Aurelio J. Ortiz, Jr., age 27, Sarah Ann Kozak, age 20, and Ramiro Astello, age 19. The twilight of this case in the trial court requires me to perform one further task: to consider and resolve the post-trial motions for judgment of acquittal and, in the alternative, new trial, brought by Ortiz, Kozak, and Astello. I am acutely aware that after lengthy deliberation, the jury conscientiously selected in this case has rendered its verdict of "guilty." Nevertheless, my duties and obligations are not discharged because the jury has spoken. I must now consider, *inter alia*, whether upholding the jury's verdict will result in a miscarriage of justice:

> "On [a motion for new trial] it is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that the verdict ... will result in a miscarriage of justice.... The exercise of this power is not in derogation of the right of trial by jury but is one of the historic safeguards of that right."

*United States v. Logan*, 861 F.2d 859, 866 (5th Cir.1988) (Brown, J., dissenting) (quoting *Aetna Cas. & Sur. Co. v. Yeatts*, 122 F.2d 350, 352–53 (4th Cir.1941)).

## I. BACKGROUND

On July 17, 1997, a United States Grand Jury for the Northern District of Iowa returned a three-count indictment charging Aurelio Ortiz, Sarah Ann Kozak, Ramiro Astello—and others—with kidnapping, conspiracy to commit kidnapping, and using or carrying a firearm during the commission of a crime of violence, in violation of 18 U.S.C. §§ 1201(a), 1201(c), and 924(j) respectively. These charges arose from events surrounding the kidnapping and murder of Gregory Sky Erickson ("Sky") in June of 1997. To provide some factual context for the pending motions, the court will set forth the respective theories of the

case offered by the government and the defendants.

The government's theory of the case is essentially set forth in the indictment: On or about June 5, 1997, Kozak drove Luis Lua, Shawn Knakmuhs, and Benjamin Alden from Estherville, Iowa, to Spencer, Iowa, to find Sky. Upon arriving in Spencer, Lua, Knakmuhs, and Alden confronted Sky about a drug debt Sky owed Lua. The trio received some methamphetamine and a small amount of money from Sky as partial payment. The next day, on or about June 6, 1997, Kozak drove Ortiz and Alden from Estherville, Iowa, to Spencer, Iowa, to an apartment rented by Eric Sebasta and frequented by Sky. Lua and Knakmuhs also traveled from Estherville to the apartment in Spencer, but in a separate vehicle. When this group of individuals gathered at the apartment, Sky was not present. Kozak then drove Alden and another individual to a Spencer golf course to find Sky. Alden informed Sky that Lua was at the apartment and wished to talk to him. Sometime later, after Sky arrived at the apartment, he was taken to a bedroom by Lua, Knakmuhs, and Ortiz. In this bedroom, Sky was confronted about the remaining drug debt he owed Lua, Castillo, and Ortiz, and beaten. Thereafter, Kozak drove Sky, Lua, and Ortiz back to Estherville. Upon arriving in Estherville, Kozak dropped Lua and Sky off at Lua's residence. Later that evening, Lua contacted Astello and directed Astello to come to Lua's residence because Lua had Sky there. Astello drove Lua, Sky, and a juvenile to Fort Defiance State Park where they met and picked up two other juveniles. The group proceeded on to Swan Lake. There, Sky was again beaten, this time by Lua, Astello, and the juveniles. After the beating, Sky was placed in the trunk of Astello's car and driven to an abandoned farmhouse in Minnesota. Upon arriving at the farmhouse, Sky was removed from the trunk and taken to the basement where Lua shot him in the head.

The defendants' theory of the case differs dramatically from the government's. The defendants contend that on June 6, 1997, Sky had the funds to pay the drug debts he owed Lua and Ortiz but that he declined to pay Lua in order to force an in-person meeting with Lua's drug boss—Ricardo Castillo. According to the defendants, Sky's need to have a meeting with Castillo in Estherville stemmed from an agreement he had made during a meeting with his father and a Spencer police officer. During this meeting, which took place on May 30, 1997, Sky agreed to serve as a "confidential informant" for the Spencer police. In this role, Sky was to gather recent information about drug dealers, and to verify that a given drug dealer (such as Castillo) was in possession of a substantial amount of drugs by personally observing the drugs. Sky hoped that the information he gathered could be used as leverage to have the two criminal charges pending against him reduced or dismissed. The defendants also contend that the confrontation that occurred in the Spencer apartment bedroom was just a part of doing business for this group of drug dealers. The defendants argue that Sky knew a confrontation was likely when he went to the apartment, and that he consented to it. Further, the defendants argue that Sky not only consented to go with the group from Spencer to Estherville on that fateful day, but requested to do so. Indeed, according to the defendants, Sky needed to meet with "the man," meaning Ricardo Castillo, to obtain the information necessary in his new role as an undercover drug informant.

Only defendants Ortiz, Kozak, and Astello elected to proceed to trial. A fifteen-day jury trial began in this matter on July 6, 1998. Due to substantial pre-trial publicity, jury selection took approximately four days—nearly eight times longer than jury selection in a typical criminal case in this district. At the close of the government's case-in-chief, all three defendants moved for judgment of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, on all three counts raised in the indictment. The court denied Astello's motion, and reserved ruling on the motions

made by Ortiz and Kozak. At the conclusion of all evidence, the three defendants renewed their Rule 29 motions. Again, the court denied Astello's motion, and reserved ruling on the motions made by Ortiz and Kozak. On July 30, 1998, following nearly one week of deliberations, the jury returned a verdict finding all three defendants guilty of Counts I and II—kidnapping and conspiracy to commit kidnapping. Additionally, the jury found Ortiz and Astello guilty of Count III—using or carrying a firearm during and in relation to a crime of violence or a drug-trafficking crime. The jury acquitted Kozak of this firearm charge.

Oritz, Kozak, and Astello have each filed timely post-trial motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c), as well as motions for new trials pursuant to Federal Rule of Criminal Procedure 33. The government has resisted the defendants' post-trial motions. At long-last, after extensive briefing and two rounds of oral arguments, the matters are now fully submitted.

## II. LEGAL ANALYSIS

### A. The Motions For Judgment Of Acquittal

In their motions for judgment of acquittal, Ortiz, Kozak, and Astello each challenge the sufficiency of the evidence to support their respective convictions. Essentially, the defendants contend that the evidence presented at trial was insufficient to permit a reasonable jury to find them guilty beyond a reasonable doubt.

### 1. Standards applicable to motions for judgment of acquittal

The court has recently considered in detail the standards applicable to motions for judgment of acquittal, *see United States v. Saborit*, 967 F.Supp. 1136, 1138–40 (N.D.Iowa 1997), and will set forth the highlights of that discussion, as well as some more recent case law, here. Rule 29 of the Federal Rules of Criminal Procedure provides, in pertinent part, as follows:

> The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

FED.R.CRIM.P. 29(a). Although Rule 29 specifically provides for such eventualities, it is well-settled that "[j]ury verdicts are not lightly overturned." *United States v. Hood*, 51 F.3d 128, 129 (8th Cir.1995); *accord United States v. Burks*, 934 F.2d 148, 151 (8th Cir.1991). Rather, the case law governing motions for judgment of acquittal confirms that a significant restraint is placed on a district court's authority to overturn a jury's verdict. *See United States v. Gomez*, 165 F.3d 650, 654 (8th Cir.1999) (observing that a judgment of acquittal should only be granted "if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt."); *United States v. Perkins*, 94 F.3d 429, 436 (8th Cir.1996) (" '[t]he standard of review of an appeal concerning the sufficiency of the evidence is very strict, and the verdict of the jury should not be overturned lightly.' ") (quoting *Burks*, 934 F.2d at 151), *cert. denied*, 519 U.S. 1136, 117 S.Ct. 1004, 136 L.Ed.2d 882 (1997).

The United States Court of Appeals for the Eighth Circuit has therefore instructed that "[t]he jury's verdict must be upheld if there is an interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *United States v. Moore*, 108 F.3d 878, 881 (8th Cir.1997); *Perkins*, 94 F.3d at 436 (" 'The jury's verdict must be upheld if there is an interpretation of the evidence that would allow a reasonable-minded jury to conclude guilt beyond a reasonable doubt.' ") (quoting *United States v. Erdman*, 953 F.2d 387, 389 (8th Cir.), *cert. denied*, 505 U.S. 1211, 112 S.Ct. 3009, 120 L.Ed.2d 883 (1992)). Here, Ortiz, Kozak, and Astello contend that their

motions for judgment of acquittal should be granted because the government's evidence at trial would not permit a reasonable jury to find them guilty beyond a reasonable doubt.

■ In considering a motion for judgment of acquittal based on the sufficiency of the evidence, the court must "view the evidence in the light most favorable to the guilty verdict, giving the government the benefit of all reasonable inferences that may be drawn from the evidence."[1] *United States v. Basile*, 109 F.3d 1304, 1310 (8th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 173, 139 L.Ed.2d 115 (1997); *accord United States v. Vig*, 167 F.3d 443, 447 (8th Cir.1999) (observing that "[w]e review the district court's denial of a motion for judgment of acquittal based on the sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict."). The court can overturn a jury's verdict only if " 'a reasonable fact-finder must have entertained a reasonable doubt about the government's proof' " of one of the essential elements of the crime charged. *United States v. Kinshaw*, 71 F.3d 268, 271 (8th Cir.1995) (quoting *United States v. Nunn*, 940 F.2d 1128, 1131 (8th Cir.1991)). Furthermore, "[t]his standard applies even when the conviction rests entirely on circumstantial evidence." *United States v. Davis*, 103 F.3d 660, 667 (8th Cir.1996), *cert. denied*, 520 U.S. 1258, 117 S.Ct. 2424, 138 L.Ed.2d 187 (1997).

■ In addition to allowing a conviction to be based on circumstantial and/or direct evidence, the Eighth Circuit Court of Appeals has instructed that "[t]he evidence need not exclude every reasonable hypothesis except guilt." *United States v. Baker*, 98 F.3d 330, 338 (8th Cir.1996), *cert. denied*, 520 U.S. 1179, 117 S.Ct. 1456, 137 L.Ed.2d 561 (1997). The court can neither weigh the evidence nor assess the credibility of the witnesses; these tasks belong exclusively to the jury. *United States v. Ireland*, 62 F.3d 227, 230 (8th Cir.1995) (noting it is the jury's job to judge the credibility of witnesses and to resolve contradictions in evidence). Having examined the appropriate standard of review, the court turns now to its consideration of the defendants' motions.

### 2. *Sufficiency of the evidence*

The court will begin by considering the sufficiency of the evidence to support the defendants' convictions on the kidnapping charge set forth in Count I of the indictment. The government submitted three theories of liability upon which the jury could find Ortiz, Kozak, and Astello guilty of this offense: personal acts; aiding and abetting; and co-conspirator liability. In order to convict the defendants of this charge, the government was required to prove beyond a reasonable doubt at least one of these theories of liability against each defendant. The jury convicted Oritz and Astello of this offense under all three

---

1. In *Saborit*, the court discussed two apparently inharmonious lines of Eighth Circuit authority regarding the standard to be applied when considering a challenge to the sufficiency of the evidence to sustain a conviction. *Saborit*, 967 F.Supp. at 1140–43 (referring to *United States v. Baker*, 98 F.3d 330, 338 (8th Cir.1996), *cert. denied*, 520 U.S. 1179, 117 S.Ct. 1456, 137 L.Ed.2d 561 (1997) (observing that if the evidence reasonably supports two conflicting hypotheses—guilt and innocence—the reviewing court must not disturb the jury's finding) and *United States v. Davis*, 103 F.3d 660, 667 (8th Cir.1996), *cert. denied*, 520 U.S. 1258, 117 S.Ct. 2424, 138 L.Ed.2d 187 (1997) (holding that " '[w]here the government's evidence is equally strong to infer innocence of the crime charged as it is to

infer guilt, the verdict must be one of not guilty ...' " quoting *United States v. Kelton*, 446 F.2d 669, 671 (8th Cir.1971))). The court observes, as it did in *Saborit*, that during the last ten years, the United States Court of Appeals for the Eighth Circuit has overwhelmingly applied the *Baker* standard—that is, if the evidence reasonably supports two contrary theories, the reviewing court must not disturb the jury's determination. *Id.* (citing *Baker*, 98 F.3d at 338); *see also United States v. Turner*, 157 F.3d 552, 556 n. 5 (8th Cir.1998) (noting apparent discrepancy and following *Baker* ). The parties have not raised the issue here. However, the court concludes that regardless of the standard applied in this case, the result as to the defendants' motions for judgment of acquittal would be the same.

available theories—personal acts, aiding and abetting, and co-conspirator liability. Kozak was convicted under the latter two theories—aiding and abetting and co-conspirator liability.

Ortiz and Kozak contend that the evidence was insufficient to find them guilty under any of these theories because the government was unable to prove that Sky did not consent to travel from Spencer to Estherville. Ortiz and Kozak argue that because there was insufficient evidence to show that Sky was taken against his will from Sebasta's apartment in Spencer to Estherville, no kidnapping—at least during the period they were involved—occurred. Likewise, Astello contends that the evidence was insufficient to prove him guilty under any of these theories, because the question of Sky's consent continued to be at issue once Lua and Sky arrived in Estherville. Essentially, Astello argues that the government failed to prove Sky was taken against his will up to the point when the group arrived at Swan Lake. At that point, Astello argues that, although it became clear Lua intended to kill Sky, Astello was powerless to stop the killing, because he was coerced by Lua's drug-induced rage.

██ Turning first to defendant Astello, I find that there is more than sufficient evidence to support his conviction for kidnapping. Viewing the evidence in the light most favorable to the government, *see Basile*, 109 F.3d at 1310, a reasonable jury most certainly could have found that by the time Astello became involved—that is, after Lua and Sky arrived in Estherville on June 6, 1997—Sky was being held against his will. For example, a reasonable jury could have found that Sky was bound at the time Astello arrived at Lua's residence, and was subsequently blindfolded and otherwise forcibly detained during the transport to Fort Defiance State Park, the transport to Swan Lake and, ultimately, the transport to the farmhouse in Minnesota. As for Astello's involvement, the evidence clearly supports a finding that Astello was instrumental in transport-ing Sky to the Minnesota farmhouse where Sky was ultimately shot and killed. Representative acts include assisting Lua and others in forcing Sky into the trunk of the car, driving the car—erratically at times—in order to not only transport Sky but also to injure him in the process, and suggesting that Sky be taken to the abandoned farmhouse where Astello had formerly lived after it became obvious that Lua intended to kill Sky. I conclude—without hesitation or difficulty—that there is sufficient evidence to support the conviction on Count I against this defendant.

██ The evidence presented against Ortiz and Kozak differs dramatically from the evidence presented against Astello. Unlike Astello, Ortiz and Kozak were not present at the scene of Sky's death. Nor were Ortiz and Kozak present at any point along the route from Lua's residence to the Minnesota farmhouse were Sky was killed—they were not present at the meeting with Castillo, at Lua's residence where Sky was bound, at Fort Defiance State Park where the additional juveniles were met and picked up for the journey (although the park is across the road from the Kozak family residence), or at Swan Lake where Sky was brutally beaten. Ortiz and Kozak correctly point out that there is substantial evidence in the record suggesting that Sky requested to be taken to Estherville to meet "the man" or "the dude"—referring to Ricardo Castillo—and that Sky was highly motivated to do so to gain information that would help him strike a deal with law enforcement officers to reduce or eliminate the criminal charges pending against him. However, there is also evidence in the record from which the jury could conclude that Sky was restrained and threatened with force to do as he was told in Sebasta's apartment. No doubt, there is contradictory evidence in the record regarding Sky's consent to make the trip from Spencer to Estherville. However, on defendants' motions for judgment of acquittal, this conflicting evidence must be viewed through a lens that por-

trays the evidence only in the light "most favorable to the government." Viewing the evidence through such a lens, and giving the government the benefit of all reasonable inferences, I conclude that there is sufficient evidence in the trial record to support the jury's conviction of Ortiz and Kozak on the kidnapping charge.

 Kozak raises one additional argument. She argues that even if Sky was taken against his will, she did not know about it. Because Kozak was not present in the bedroom—or perhaps the apartment itself—during the confrontation, her argument on this point is forceful. Nevertheless, there is evidence in the record to support a finding that Kozak transported several individuals—on two occasions—from Estherville to Spencer for purposes of meeting with Sky. The evidence presented also suggests that Kozak knew that Sky owed a drug debt to Lua and Ortiz, parked her car out of view of Sebasta's apartment, and aided in the search for Sky once the group arrived in Spencer on June 6. Additionally, Kozak supplied and drove the vehicle used to transport Sky from Spencer to Estherville. Later, when questioned about her involvement in the events preceding Sky's death, Kozak lied to authorities. Although I consider it to be an extremely close call, under the applicable Rule 29 standards, I conclude that a reasonable jury could have convicted Kozak of the kidnapping charge. *See Baker*, 98 F.3d at 338.

Next, Ortiz, Kozak, and Astello argue that there is insufficient evidence to support their convictions on the charge of conspiracy to commit kidnapping, as set forth in Count II of the indictment. Again, viewing the evidence in the light most favorable to the government, and resolving all evidentiary conflicts in the government's favor, I conclude that the activities outlined above provide evidence sufficient to permit the jury to convict all three defendants on this charge.

 Finally, Ortiz and Astello seek judgment of acquittal on their convictions on Count III—using or carrying a firearm during and in relation to a crime of violence or a drug-trafficking crime. As with the charge of kidnapping in Count I, the government again submitted several theories of liability under which the defendants could be found guilty of the firearm charge: personal acts; aiding and abetting; co-conspirator liability for an act in furtherance of a kidnapping conspiracy; and co-conspirator liability for an act in furtherance of a drug-trafficking conspiracy. The jury found Ortiz and Astello guilty under each of these four theories.

I have reviewed the evidence under the Rule 29 standards, and conclude that there is sufficient evidence to sustain the convictions on this count. A reasonable jury could have found that Astello used or carried a firearm during the trip from Estherville to the Minnesota farmhouse where Sky was later killed with the weapon. Moreover, a reasonable jury could have concluded that Astello agreed with Lua and others that everyone present, including Astello, would fire a bullet into Sky's body once they arrived at the farmhouse. Similarly, a reasonable jury could have found that Ortiz provided a firearm for both trips from Estherville to Spencer. The finding that Ortiz used a firearm to beat, threaten, and intimidate Sky—specifically, forcing the weapon into Sky's mouth and throat—would also have been permissible, viewing the evidence in the light most favorable to the government, and not weighing the credibility of the witnesses anew.

In summary, I find that the defendants' motions for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure should be denied in their entirety.

### B. The Motions For New Trial

Each of the defendants has also moved for a new trial pursuant to Rule 33 of the Federal Rules for Criminal Procedure. Because the standards under which these motions are evaluated differ substantially from those applied to motions for judg-

ment of acquittal, the court will begin by setting forth the governing standards, and will then turn to its consideration of the defendants' motions for new trial.

### 1. Standards applicable to motions for new trial

In *Saborit*, this court also had occasion to consider in some detail the standards applicable to motions for new trial. *Saborit*, 967 F.Supp. at 1144–45. Rather than repeat that discussion in its entirety here, the court will again set forth the highlights of these standards.

■ Federal Rule of Criminal Procedure 33 provides in relevant part as follows: "The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice." FED. R.CRIM.P. 33.[2] District courts have broad discretion in passing upon motions for new trial and such rulings are subject to reversal only for a clear abuse of discretion. *See United States v. Wilkins*, 139 F.3d 603, 604 (8th Cir.1998); *United States v. Brown*, 108 F.3d 863, 866 (8th Cir.1997); *United States v. Blumeyer*, 62 F.3d 1013, 1015 (8th Cir.1995), *cert. denied*, 516 U.S. 1172, 116 S.Ct. 1263, 134 L.Ed.2d 212 (1996).

■ A court evaluates a Rule 33 motion from a different vantage point than it evaluates a Rule 29 motion for judgment of acquittal. "A district court's power to order a new trial is greater than its power to grant a motion for acquittal." *United States v. Ruiz*, 105 F.3d 1492, 1501 (1st Cir.1997); *accord United States v. Bennett*, 956 F.2d 1476, 1481 (8th Cir.1992) ("This narrowly constricted power of review [applicable to motions for judgment of acquittal] is in contrast to the district court's broad discretion in ruling upon a

motion for new trial."); *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211 (9th Cir.1992) ("A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal."). In assessing whether the defendants are entitled to a new trial on the ground that the verdict is contrary to the weight of the evidence, "the district court weighs the evidence and evaluates anew the credibility of the witnesses to determine if a miscarriage of justice may have occurred." *Davis*, 103 F.3d at 668; *accord United States v. Misle Bus & Equip. Co.*, 967 F.2d 1227, 1232 (8th Cir.1992); *United States v. Brown*, 956 F.2d 782, 786 (8th Cir.1992). As the United States Court of Appeals for the Eighth Circuit has explained:

> "When a motion for a new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different from those raised by a motion for judgment of acquittal. The question is whether he is entitled to a new trial. In assessing the defendant's right to a new trial, the court must weigh the evidence and in doing so evaluate for itself the credibility of the witnesses." *United States v. Lincoln*, 630 F.2d [1313,] 1316 [ (8th Cir.1980) ]. The court will only set aside the verdict if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred.

*United States v. Rodriguez*, 812 F.2d 414, 417 (8th Cir.1987). The authority to grant new trials, however, "should be used sparingly and with caution." *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980).

2. The power of the court to set aside a jury verdict and to grant a new trial precedes the United States Constitution, the constitutions of the American colonies, the Declaration of Independence, and the Magna Carta. It has a long tradition in the English common law, and was well-rooted in England as early as 1665. *See Aetna Cas. & Sur. Co.*, 122 F.2d at 353 (citing *Smith v. Times Pub. Co.*, 178 Pa.

481, 36 A. 296, 298 (Pa.1897)). The importance of the court's power to grant a new trial is reflected by Justice Mitchell's observation that without it, "the jury system would be a capricious and intolerable tyranny ... [therefore, it is] a power the courts ought to exercise unflinchingly." *Id.* (quoting *Smith*, 36 A. at 298).

## 2. Weight of the evidence

In their motions for new trial, Ortiz, Kozak, and Astello each challenge the weight of the evidence supporting their convictions, asserting that the evidence weighs heavily enough against the verdict to indicate that a miscarriage of justice has occurred. As it did in the previous section regarding the motions for judgment of acquittal, the court will begin with the arguments raised by defendant Astello. The court will then turn to a joint consideration of the arguments raised by Ortiz and Kozak.

### a. Astello

■ The linchpin of Astello's motion for new trial is that during the time Astello was voluntarily involved, Sky was a consenting participant and, therefore, no kidnapping occurred. In support of this argument, Astello points to evidence that Sky was attempting to act as a confidential informant on the night of his death, and for that reason consented to the trip to Estherville as well as to the beating—allegedly ordered by Castillo—that he was to receive in the "boondocks." Astello also directs the court's attention to evidence that by the time Sky withdrew his consent to the activities at Swan Lake, Astello was powerless to intervene, because he was coerced by Lua's drug-induced rage to comply with Lua's commands. I have carefully considered these arguments and conclude that they are without merit.

Contrary to Astello's assertions, the verdict convicting Astello of kidnapping and conspiracy to commit kidnapping is not contrary to the weight of the evidence. *Rodriguez*, 812 F.2d at 417. My review of the evidence shows that the record supports the finding that when Astello arrived at Lua's residence on the night of June 6, 1997, Sky was being held against his will. Moreover, Astello's instrumental involvement in the events that followed—i.e., the trip to Swan Lake and attendant beating, forcing Sky into the trunk of the car, and choosing and driving to the abandoned farmhouse in Minnesota—dispel any serious doubt that a miscarriage of justice would occur by upholding the verdict against this defendant. As for Astello's coercion defense, I have reviewed the evidence and evaluated the credibility of witnesses Astello claims support this defense, and conclude that the jury's rejection of this defense was not only permissible but also fails to rise to the level of a miscarriage of justice.

Finally, to the extent Astello argues he is entitled to a new trial on Count III, the firearm charge, the argument is rejected. As indicated previously, it is virtually undisputed that Astello used or carried a firearm during the trip from Estherville to the Minnesota farmhouse where Sky was killed and that he joined in an agreement to fire a bullet into Sky's body once the group arrived at the farmhouse. Under these circumstances, I discern no likelihood for a miscarriage of justice in allowing Astello's conviction on Count III to stand. In sum, I conclude that Astello's motion for new trial must be denied and that the jury verdict convicting him on all three counts must be upheld.

### b. Ortiz and Kozak

As the parties are well aware, I have been, and continue to be, troubled by the weight of the evidence offered in support of the charges of kidnapping and conspiracy to commit kidnapping brought against Ortiz and Kozak. Unlike Astello, Ortiz and Kozak were not involved in Sky's transportation from Estherville to Minnesota or present at the scene of Sky's death. Therefore, to obtain convictions on these two counts against Ortiz and Kozak, the government was required to prove beyond a reasonable doubt that a kidnapping and a conspiracy to commit kidnapping actually occurred either before or during the trip from Spencer to Estherville on June 6, 1997.[3]

■ As indicated previously, my obligation in ruling on a motion for new trial

---

**3.** The undisputed evidence reflects that Kozak and Ortiz dropped Lua and Sky off after returning to Estherville, and had no further contact with Lua or Sky before Sky's death.

brought on the ground that the verdict is against the weight of the evidence is substantially different than my obligation in ruling on a motion for judgment of acquittal. *See Ruiz*, 105 F.3d at 1501. To resolve a motion for new trial, I must weigh the evidence and evaluate for myself the credibility of the witnesses to determine if a miscarriage of justice may have occurred. *See Davis*, 103 F.3d at 668. Applying this standard, I find that the evidence presented at trial weighs heavily *against* a verdict premised on a finding of a kidnapping *from Spencer to Estherville*, and that Ortiz and Kozak joined in an agreement to kidnap Sky.

The inadequacy of proof relative to Count I—the kidnapping charge—concerns the element of consent. In order to prove that a kidnapping occurred, the government was required to show that Sky was taken or otherwise held against his will.[4] I have had the opportunity to evaluate the credibility of the witnesses and to otherwise weigh the evidence presented at trial, and am compelled to conclude that the evidence weighs against a finding beyond a reasonable doubt that Sky was taken against his will from Spencer to Estherville on June 6, 1997. The evidence shows that just prior to his arrival at Sebasta's apartment, Sky obtained $800.00 in cash, ostensibly to pay the drug debts he owed Lua and Ortiz. When the confrontation over the drug debts occurred in the bedroom, Sky produced only a portion of this sum—approximately $400.00— which Lua gave to Ortiz. The record is

silent as to why Sky did not produce the remaining cash to pay Lua. I believe that Sky intentionally withheld a portion of the money so that he would have a reason to be escorted to see "the man"—Ricardo Castillo. This finding is supported by the evidence that Sky stated he wished to go "see the man" or "the dude"—referring to Ricardo Castillo. Of course the evidence also demonstrates that Sky was beaten and otherwise abused in the bedroom. Nevertheless, the evidence regarding Sky's ability to pay the debts, combined with the evidence that Sky had a motive to gather information about Castillo's drug operation, and that Sky needed to gather this evidence by seeing Castillo with the drugs personally, is more than sufficient to create a strong inference that Sky agreed to accompany Lua to Estherville.[5] At bottom, in viewing and weighing all of the evidence I find that the government has failed to establish beyond a reasonable doubt that Sky was kidnapped from Spencer to Estherville on June 6, 1997.

This finding is not undermined by the testimony of the government's key witness regarding the events that occurred in Spencer—Ben Alden. I recognize that Alden's testimony, when viewed in the light most favorable to the government, may have been sufficient to permit the jury to convict Ortiz and Kozak of kidnapping. However, on a motion for new trial, I am required to evaluate the credibility of witnesses—including Ben Alden—anew. *See Davis*, 103 F.3d at 668. I have undertaken the requisite evaluation and am not inclined to afford Alden's testimony much

4. Specifically, in Final Instruction No. 7, the court set forth the consent element of kidnapping as follows:

> *One*, on or about June 6, 1997, the defendant knowingly and willfully seized, confined, kidnapped, abducted, or carried away Gregory Sky Erickson against Erickson's will from Emmet County, Iowa and from and through other counties in Iowa. To "kidnap" a person means unlawfully to hold, keep, detain, and confine the person against that person's will. The victim's lack of consent is therefore a fundamental element of kidnapping. Al-

> though you may find that the victim initially agreed to accompany the alleged kidnappers, this element is proved if you find that there is a point at which the victim no longer consented to accompany them. There can be no kidnapping before that point.

Final Instruction No. 7—Elements of Kidnapping.

5. The parties presented evidence that Sky had had previous difficulties with law enforcement, and that he believed he could help his own legal situation by obtaining evidence about Castillo's drug ring.

weight. Alden's testimony was rife with equivocation on the issue of Sky's "willingness" to go to Estherville. Additionally, there were numerous discrepancies between Alden's initial statements and the testimony he provided at trial. For example, I did not find credible Alden's belated assertions that Ortiz shoved a gun down Sky's throat in the bedroom of Sebasta's apartment—perhaps the government's most crucial evidence that Sky was coerced to go from Spencer to Estherville. On cross-examination, Alden acknowledged that in his initial statements to authorities he had not mentioned seeing a gun in the apartment bedroom, let alone observing Ortiz shoving a weapon down Sky's throat. Alden further acknowledged that he did not mention these alleged events until he realized that he would have to produce some evidence the government did not already have in order to obtain a government motion for a downward departure regarding his sentencing range. This was Alden's best hope of avoiding a life sentence. Although Alden's desire to secure a substantial assistance motion from the government does not automatically cast doubt upon the veracity of his testimony at trial, I find it untenable that Alden would simply "forget" to mention something as brutal, unusual, and probative as Ortiz shoving a gun down Sky's throat. In my view, the more likely explanation for Alden's belated remembrance of this event was Alden's desire to have his own life sentence reduced. Under these circumstances, I find Alden's testimony on this matter to be incredible.

In sum, I have considered all of the evidence presented on the issue of Sky's consent to the trip from Spencer to Estherville and I find that this evidence falls far short of proof beyond a reasonable doubt that Sky was coerced into making this trip. Accordingly, I find that the evidence weighs heavily enough against the verdict convicting these two defendants of kidnapping that allowing the verdict to stand will result in a miscarriage of justice.

Similarly, weighing the evidence anew— as I must in considering a motion for new trial—I conclude that the evidence Ortiz and Kozak entered into a conspiracy to commit kidnapping weighs heavily enough against the verdict that a miscarriage of justice has occurred. Having reached the conclusion that the evidence presented at trial weighs against the finding of a kidnapping from Spencer to Estherville, I further find that there is no convincing evidence that these two defendants entered into any agreement to kidnap Sky, either before that trip or at some later time. In fact, the evidence is undisputed that once the group arrived in Estherville, Kozak dropped Sky and Lua off and neither she nor Ortiz had any further contact—physical or otherwise—with Lua or Sky before Sky's death. Although I have no doubt that the events following Sky's arrival in Estherville on June 6, 1997, culminated in his kidnapping and subsequent murder, I am unable to find on this record that Ortiz and Kozak entered into any agreement—at any time—to commit that kidnapping. Under these circumstances, allowing the jury's verdict convicting Ortiz and Kozak of Count II to stand would result in a miscarriage of justice.

 Although I find that Ortiz and Kozak are entitled to a new trial on Counts I and II, I am not persuaded that upholding Ortiz's conviction on the firearm charge set forth in Count III of the indictment will result in a miscarriage of justice. The jury found Ortiz guilty of this offense under four separate theories. Although my decision on Counts I and II eliminates one of these theories as a permissible basis for the conviction—co-conspirator liability for an act in furtherance of a kidnapping conspiracy—it does not undermine the jury's finding of guilt on this count under the theories of personal acts, aiding and abetting, and co-conspirator liability for an act in furtherance of a drug trafficking conspiracy. I have carefully reviewed the evidence and find no grounds for a new trial on this conviction.

Although the court's discussion regarding the defendants' motions for judgment

of acquittal demonstrates that sufficient evidence exists to support the convictions, that conclusion was reached only when construing the evidence in the light most favorable to the guilty verdict, giving the government the benefit of all reasonable inferences that may be drawn from the evidence. However, employing the much less restrictive standard of review applicable to motions for new trial, I conclude that the evidence weighs heavily enough against portions of the verdict that a miscarriage of justice has occurred in this case.[6]

## III. CONCLUSION

My oath of office requires me to "administer *justice* without respect to persons, and do equal right to the poor and to the rich, and ... faithfully and impartially discharge and perform all duties incumbent upon me as a United States District Judge under the Constitution and laws of the United States." 28 U.S.C. § 453 (emphasis added). To fulfill this oath, I must sometimes make decisions that are unpopular. This is, no doubt, such a decision. However, as United States District Judge Shadur has observed:

> [J]udging is not a popularity contest. One of the great strengths of our Constitution's Article III, with its guaranty of federal judicial independence, is that the federal judge can render justice without concern as to public perceptions (or more frequently misperceptions) of the decisions involved.

*Duran v. O'Grady*, 1989 WL 111904 *1 (N.D.Ill. Sept.18, 1989). The United States Constitution forbids popularity from serving as a guiding principle for a federal judge. Safeguarding the rights of the criminally accused—a cornerstone of our Constitution and democracy—has seldom been popular in practice, despite its intellectual appeal. As my distinguished colleague, Senior United States District Court Judge Harold Vietor observed in a different context over a decade ago:

> [T]he enforcement of constitutional rights is not subject to the pleasure of the majority. It would be the antithesis of the concept of constitutional law to apply the protection of the Constitution, which is the fundamental law of our land, in any given situation only if the majority at the relevant time and place approved. The Constitution protects all of us, including those who are in the minority.

*Graham v. Central Community Sch. Dist.*, 608 F.Supp. 531, 537 (S.D.Iowa 1985). I cannot meet my judicial obligations by affirming convictions and denying motions for new trial if I am convinced, after a dispassionate and exhaustive review of the record, that however faithfully the members of the jury performed their duties, their verdict results in a miscarriage of justice. This is true regardless of the horrific nature of the crime—here, the brutal murder of a fifteen year-old boy and the public outrage against the accused.

With these tenets in mind, I conclude as follows:

Viewing the evidence presented by the government in the light most favorable to the government, I find that a reasonable jury could have found all three defendants guilty of kidnapping and conspiracy to commit kidnapping in violation of 18 U.S.C. §§ 1201(a) and 1201(c). I further find that a reasonable jury could have found defendants Ortiz and Astello guilty of using or carrying a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(j). Therefore, the **defendants' motions for judgment of acquittal are denied.**

In considering the defendants' motions for new trial, I have reviewed the evidence anew and weighed for myself the credibility of the witnesses who testified. Under these standards, I find that with respect to

---

**6.** Unlike Astello, Ortiz and Kozak have raised additional arguments in support of their motions for new trial. Because the court has resolved these motions in favor of Ortiz and Kozak on their "weight of the evidence" arguments, it need not address the additional grounds raised in the briefs.

the verdict rendered against defendant Astello, no miscarriage of justice has occurred. Similarly, I find no miscarriage of justice that warrants disturbing defendant Ortiz's conviction on the firearm charge set forth in Count III.

However, I do find that the evidence supporting the convictions of defendants Ortiz and Kozak on Counts I and II—kidnapping and conspiracy to commit kidnapping—weighs heavily enough against the verdict that a miscarriage of justice has occurred in this case. After more reflection and thought than I have given any judicial decision I have been called upon to make, I find that defendants Ortiz and Kozak are entitled to a new trial on these two charges. Though I make this decision unflinchingly and without reservation, I have not made it lightly nor hastily due in no small measure to my unwavering and abiding faith in our system of trial by jury. I recognize that setting aside a decision of the jury "is a most solemn, serious, judicial duty of a trial Judge." *Logan*, 861 F.2d at 867 n. 5. In exercising this cherished power and duty to set aside a jury verdict where there is a miscarriage of justice, I believe this "long-established, long-recognized, long-revered ultimate safeguard to liberty and justice" is preserved. *See id.* One final point. Granting a new trial for defendants Ortiz and Kozak does not detract from the excellent efforts of the two experienced Assistant United States Attorneys who prosecuted the case. They prosecuted this case zealously and professionally and in doing so, fulfilled the highest calling of a federal prosecutor. **The verdict as to Counts I and II against defendants Ortiz and Kozak is set aside. Ortiz and Kozak are granted a new trial on these two counts. In all other respects, the defendants' motions for judgment of acquittal and new trial are denied.**

**IT IS SO ORDERED.**